# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3395

CERTAIN UNDERWRITERS AT
LLOYD'S LONDON,

*Petitioners-Appellees,*

*v.*

ARGONAUT INSURANCE COMPANY,

*Respondent-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 5852—**Mark R. Filip**, *Judge.*

———————

ARGUED JANUARY 19, 2007—DECIDED AUGUST 29, 2007

———————

Before RIPPLE, KANNE and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Certain Underwriters at Lloyd's
London ("Underwriters") entered into a reinsurance
contract with Argonaut Insurance Company ("Argonaut").
A dispute over coverage arose, and Argonaut demanded
arbitration in accordance with the contract. Further dis-
putes arose related to the arbitration, and Underwriters
filed a petition in the United States District Court for the
Northern District of Illinois under the Federal Arbitration
Act ("FAA"), 9 U.S.C. § 1, *et seq.* It sought an order confirm-

ing a panel of arbitrators. After preliminary proceedings, the parties filed cross-motions for summary judgment. The district court granted summary judgment for Underwriters and thus confirmed the panel of arbitrators. Argonaut timely appeals. For the reasons stated in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

Underwriters, a reinsurance syndicate whose participants include citizens of the United Kingdom, entered into certain reinsurance contracts, or "treaties," with Argonaut, a California-based insurer. The treaties contain an arbitration provision as well as a further clause that details the responsibilities of the parties in selecting the arbitration panel. That clause provides, in pertinent part:

> If any dispute shall arise between the Company and the Underwriters with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, this dispute shall be referred to three arbitrators, one to be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty days after receipt of written notice from the other party requesting it to do so, the requesting party may nominate two arbitrators, who shall choose the third.

R.1, Ex. 1 at Art. 15.

Argonaut settled certain asbestos-related claims with one of its insured parties, Western MacArthur. Argonaut then made a claim for reimbursement from Underwriters

under the reinsurance treaties. Before processing the claim, Underwriters sought additional information from Argonaut and, in response, Argonaut sent an arbitration demand. That demand, made on August 4, 2004, included a request that Underwriters name its arbitrator within 30 days. Underwriters complied with the deadline and named its arbitrator on September 3.

On August 6, 2004, before Underwriters nominated its arbitrator, it sent a demand that Argonaut nominate its arbitrator. Consistent with the treaty, Underwriters' demand also invoked the thirty-day time limit; although the demand did not specifically so note, the expiration of Argonaut's thirty-day period would come on Sunday, September 5, 2004. That day, however, came and went without any word from Argonaut regarding its nomination of an arbitrator.

The following day, Monday, September 6, was Labor Day, a legal holiday in the United States, where Argonaut is located and where the arbitration proceedings were to take place, but a normal business day in the United Kingdom, where the Underwriters syndicate is based. On that day, one day after the expiration of thirty calendar days from the date of Underwriters' request for Argonaut's naming of an arbitrator, Underwriters faxed a letter to Argonaut invoking the default provision of the treaty's arbitration clause and naming a second arbitrator. R.1, Ex. 6.

In response, on Tuesday, September 7, thirty-two days after the demand had been made, counsel for Argonaut first sent an e-mail to Underwriters, representing that Argonaut's named arbitrator *had been* selected properly on the previous Friday, and notice thereof sent to Underwriters the previous week. Later in the day on the 7th,

when it became clear that, in fact, no notice had been sent during the previous week, Argonaut faxed a new letter to Underwriters naming its arbitrator. In that letter, Argonaut claimed it was not bound by the strict thirty-day deadline because its terminus was a Sunday followed by a legal holiday; instead, it claimed that it was not obligated to name the arbitrator on Sunday or on Monday and that the Tuesday, September 7, notice was a timely nomination of the second arbitrator within the meaning of the treaty.

## B.  District Court Proceedings

Because of the competing demands for arbitrators, Underwriters filed a petition in the district court under 9 U.S.C. § 5 for an order confirming the appointment of its two nominees as arbitrators in its dispute with Argonaut.

Shortly thereafter, Argonaut sent Underwriters notice that it was withdrawing "without prejudice" its initial arbitration demand, "specifically and expressly reserv[ing] all of its rights to seek recovery for any and all amounts billed to and owed by [Underwriters] with regard to this loss at any time in the future." R.4, Ex. A. After this "withdrawal," Argonaut filed a 12(b)(1) motion in the district court, seeking to have the case dismissed for want of jurisdiction. Because it had made the *only* arbitration demand in the case, Argonaut took the view that, once that demand was withdrawn, the case over the appointment of arbitrators had become moot. The district court disagreed; it concluded that Argonaut could not circumvent Underwriters' right under the clause to appoint the second arbitrator simply by ending the first arbitration proceeding with the clear intent to begin a new one.

The court granted summary judgment for Underwriters. It first noted that it had jurisdiction over the petition under Title 9, Chapter 2 of the United States Code, which implements the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (implemented by 9 U.S.C. § 201 *et seq.*) ("New York Convention" or "Convention"). The court observed that there was no genuine dispute as to any material fact and that the parties' only disagreement was over the proper interpretation of the contract default provision and its thirty-day time limit.

The parties disagreed about what law should govern the default provision in the arbitration clause of the treaty. Underwriters took the view that the matter should be decided under principles of federal common law; Argonaut urged that California law controlled.

In determining that federal common law likely should provide the rule of decision, the court focused on the need for unitary standards by which international agreements to arbitrate would be observed. Because of this particularized need for uniformity, the court concluded that there was a substantial federal interest in international agreements, sufficient to support the invocation of a federal common law rule. The court also noted that the available alternative, i.e., differing state laws on the exemption of certain days and indeed different foreign country laws on the exemption of different weekend-days and holidays (a "morass," according to the district court, R.33 at 21), would complicate unnecessarily the relationship of international parties.

Looking to this circuit's precedent, the district court determined that the substance of the appropriate federal

common law rule was to enforce strictly the terms of the agreement as written, with no extension of time for the weekend and holiday that Argonaut sought. Given that the parties in the present case are sophisticated commercial parties, the court found no basis for a federal rule which would excuse a delay not provided for by contract.

The district court then concluded that it need not rest its decision on the use of a federal common law rule because, in any event, the operative state law would produce the same result in this case.[1] Specifically, the court looked to California Civil Code § 11, which states:

> CERTAIN ACTS NOT TO BE DONE ON HOLIDAYS. Whenever any act of a secular nature, other than a work of necessity or mercy, is appointed by law or contract to be performed on a particular day, which day falls upon a holiday, it may be performed on the next business day, with the same effect as if it had been performed on the day appointed.

Elsewhere in the Code, holidays are defined to include Sundays. Cal. Civ. Code § 7; Cal. Gov. Code § 6700(a). The court concluded that the extension contained in § 11 did not apply on the facts of this case, because the Code referred to acts required to be performed *on* a particular

---

[1] The district court noted that the parties had only suggested that either California or Illinois law might apply. The court concluded that, in determining which substantive law to apply, Seventh Circuit precedent at the time left open the question of whether federal or Illinois choice-of-law principles should be employed, but that either the federal or state choice-of-law analysis would conclude that California *substantive* law should provide the state law rule of decision.

day, not *by* a particular day, as was the case in the provision at issue.

Finally, the district court declined to exercise discretion in favor of Argonaut to deny the motion for confirmation of Underwriters' arbitrators. Noting that, under the Convention, a court "*may* appoint arbitrators in accordance with the provisions of the agreement," 9 U.S.C. § 206 (emphasis added), Argonaut had contended that the court should view its authority to confirm the arbitrators as discretionary. Argonaut contended that the standard to be employed under the Convention, therefore, was different than it would be under the FAA. *See* 9 U.S.C. § 5 ("If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, *such method shall be followed.*" (emphasis added)). Again, the district court avoided the statutory interpretation issue and held that, in any event, it saw no reason to exercise discretion in favor of Argonaut under the circumstances, where two sophisticated parties could have included an extension term in their arbitration agreement, but did not. It further noted that Argonaut had instituted the arbitration process at a time of its own choosing and had elected not to appoint an arbitrator simultaneous to its demand or within the four week period *before* the Sunday deadline. The court therefore concluded "[i]f the Court has discretion, it respectfully declines to exercise it." R.33 at 27.

Argonaut timely appeals the district court's grant of summary judgment to Underwriters and denial of summary judgment to Argonaut.

## II

## DISCUSSION

We review the district court's decision granting summary judgment de novo. *Jackson v. County of Racine*, 474 F.3d 493, 498 (7th Cir. 2007). The parties agree that the material facts are not in dispute and that the interpretation of the provisions of a contract presents an issue of law.

### A. Jurisdiction

Argonaut claims that the district court erred in denying its motion to dismiss for lack of jurisdiction. In Argonaut's view, when it withdrew its arbitration demand "without prejudice," it mooted the controversy and, accordingly, the district court lacked jurisdiction to consider the merits.

As the Supreme Court has stated, the burden of demonstrating mootness is "a heavy one." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953)). Argonaut's attempt to moot the case here is not unlike that of any other defendant who, facing litigation, elects to pursue a new course to evade adjudication of the substantive issues underlying the plaintiff's case. When all indications are that the defendant is likely to pursue again the course of conduct giving rise to the action, courts have not hesitated to declare that the controversy is not moot. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) ("A controversy may remain to be settled in such circumstances, *e.g.*, a dispute over the legality of the challenged practices." (citation omitted)); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 747 (7th Cir. 1999) (declining to find a case moot by the defendant's adoption of a concededly temporary remedy). Although

these cases often deal with instances where a defendant ceases the primary conduct that is the subject of the suit, the rationale applies with equal force to cases such as this, where procedural maneuvering on the part of the respondent aims to defeat the petitioners' ability to obtain a judicial determination of their rights. Argonaut explicitly reserved its rights to institute a new arbitration proceeding, evincing its intent to move forward with a course of conduct the legality of which the district court in this action was charged with deciding. *Cf. Davis*, 440 U.S. at 631 (noting that jurisdiction may abate when "it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur" (quoting *W. T. Grant Co.*, 345 U.S. at 633) (omissions in original)). Under these circumstances, the district court correctly decided that the controversy was not moot.

**B. Interpretation of the Arbitration Agreement**

With this preliminary matter addressed, we now turn to the most significant issue presented by this case: Whether, in interpreting an arbitration agreement that falls within the New York Convention, 9 U.S.C. § 201 *et seq.*, but that contains no choice-of-law provision, we should apply a federal common law rule of decision or, through the use of choice-of-law principles, determine what appropriate state law should govern. Both parties claim that, no matter what body of law applies, the substantive law favors their position on the question of whether Argonaut's arbitrator was named in a timely fashion. Nevertheless, Underwriters chiefly argues for the application of federal substantive law while Argonaut primarily seeks to have the law of California govern the present dispute. The decision as to whether to apply federal or state law in

interpreting agreements under the Convention is a question of first impression in this circuit.

### 1. The New York Convention

We turn first to the history and purposes of the New York Convention as it was acceded to by and implemented in the United States.

The New York Convention is a multilateral treaty that entered into force on June 7, 1959. The substantive provisions of the Convention mandate first that courts of contracting nation-states give effect to arbitration provisions included in international commercial agreements; they further require courts to recognize and enforce arbitral awards made within the jurisdiction of other contracting nation-states. New York Convention, Art. II.

Consideration of the Convention was undertaken by the United Nations Economic and Social Council in response to a 1953 report issued by the International Chamber of Commerce ("ICC").[2] In that report, the ICC had concluded that two existing treaties[3] imposed onerous enforcement mechanisms that insufficiently satisfied the purposes of arbitration in the international commercial

---

[2] Int'l Chamber of Commerce, Enforcement of International Arbitral Awards: Report and Preliminary Draft Convention (ICC Brochure No. 174, 1953) U.N. Doc. E/C.2/373.

[3] Those prior conventions were the Geneva Protocol on Arbitration Clauses, Sept. 24, 1923, 27 L.N.T.S. 157 (1924), and the Geneva Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 301 (1929).

context: speedy and economical dispute resolution.[4] An international conference was convened, and the Convention was drafted with a purpose to remedy these inadequacies in existing international law governing arbitration.[5]

---

[4] Specifically, the 1927 Convention required nation-states to recognize "double exequatur." *See* Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, Art. IV, 92 L.N.T.S. 301 (1929). Double exequatur required the party pursuing award enforcement to have the award "duly authenticated" under the law of the arbitral situs and also to present evidence that the award is final and not subject to proceedings in which its validity might be contested. *Id.* One of the goals of the New York Convention was "to facilitate the enforcement of arbitration awards by enabling parties to enforce them in third countries without first having to obtain either confirmation of such awards or leave to enforce them from a court in the country of the arbitral situs." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 366-67 (5th Cir. 2003).

[5] "It was the task of the Conference to encourage recourse to the friendly arbitration of disputes and to simplify the procedures for the enforcement of awards. On behalf of the international business community, the ICC urged the Conference to adopt a simple and flexible system for the enforcement of arbitral awards which would (1) cover the widest possible area of private international disputes; (2) *avoid the difficulties inherent in any reference to the municipal law of the country in which the award was made*; (3) provide for a simple and swift enforcement of arbitral awards on the basis of evidence that the award was the final decision made by a competent arbitrator in accordance with the agreement of the parties; and (4) limit the grounds on which the enforcement of such an award could be refused to serious procedural irregularities, incompatibility with the public policy of the country of enforcement, or proof that the
(continued...)

A United States delegation participated in the 1958 negotiations; however, that delegation recommended against the United States becoming an original signatory to the Convention. In part, the delegation was concerned that the Convention would "override the arbitration laws of a substantial number of States and entail changes in State and possibly Federal court procedures." *See* U.S. Del. Rep. 22, at 2.

After that initial recommendation, support grew, both within and outside of the United States, for a uniform, economical and efficient means of resolving international commercial disputes with American citizens and entities. *See* H.R. Rep. No. 91-1181 at 1 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 3601, 3601; S. Rep. No. 91-702 at 10 (1970). Accordingly, twelve years after it initially was opened for signature, the United States acceded to the treaty. Later that year, Congress implemented the Convention by adding a second chapter to the FAA. The concern for an unintended effect on domestic laws, which had counseled against the participation of the United States in 1958, was addressed in the implementation. Specifically, § 202 of the FAA expressly limits the application of the Convention to disputes involving a foreign party, or, if only disputes involving exclusively United States citizens are involved, to circumstances in which the dispute has a "reasonable relation with one or more foreign states." 9 U.S.C. § 202.[6] Further,

---

[5] (...continued)
award had been annulled." U.N. ESCOR, 3d Sess., 3d mtg. at 6-7, U.N. Doc. E/CONF.26/SR.3 (May 21, 1958) (emphasis added).

[6] "[O]ur purpose in adhering to the [New York] Convention is for the beneficial effects it will produce for the *foreign commerce*
(continued...)

the implementing legislation makes clear that the standards contained in the FAA apply to disputes under the Convention "to the extent [the FAA] is not in conflict with [the Convention as implemented] or the Convention as ratified by the United States" although the Convention is codified as part of the FAA. 9 U.S.C. § 208. Therefore, although the Convention would displace certain domestic laws, it would do so only in the narrow context of truly international disputes; within that narrow context, where appropriate, federal arbitration law under the FAA would fill the gaps left by the Convention.

Since its implementation, many decisions have noted that the Convention demonstrates a shared understanding of the necessity for uniform rules to facilitate efficient international arbitration. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974) (noting that one goal of the Convention's adoption was to facilitate uniformity in recognition and enforcement of arbitration provisions and awards); *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96 (2d Cir. 1999) (noting the Convention's "goal of simplifying and unifying international arbitration law"); *I.T.A.D. Assocs., Inc. v. Podar Bros.*, 636 F.2d 75, 77 (4th Cir. 1981) (stating that, in interpreting and applying the Convention's provisions relating to compelling arbitration, courts "must not only observe the strong policy favoring arbitration, but must also *foster the adoption of standards which can be uniformly applied on an international scale.*" (emphasis added)).

---

[6] (...continued)
of the United States and not to make any changes with respect to matters that are traditionally within the jurisdiction of the 50 States of the Union." S. Rep. No. 91-702 at 6 (1970) (emphasis added).

### 2. Choice of Law

With this history in mind, we turn now to the primary issue in the present case: What substantive law should be applied to interpret the terms of an arbitration agreement under the Convention when the parties have not included an explicit choice-of-law provision in their contract?

No doubt because of the growing trend to include choice-of-forum and choice-of-law clauses in sophisticated commercial agreements, there is scant precedent available suggesting what law should be applied to interpret the substantive provisions of an agreement that is covered by the Convention but contains no choice-of-law provision. We note, however, that, when our sister circuits have been confronted with issues relating to agreements under the Convention—whether the question be arbitrability or enforcement or some other question—they appear to have resolved those issues by employing federal rules of decision, particularly when the parties have not provided otherwise by their contract. *See InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003) (considering whether the parties to the litigation were bound by the arbitration agreement and applying "federal common law[, which] incorporates general principles of contract . . . law"); *id.* at 143 ("A central goal of the Convention—and the driving force behind Congress's enactment of chapter 2—was to set out uniform rules governing the recognition and enforcement of international arbitration awards. Applying varying state standards in cases falling within the Convention's ambit would be in tension with the elemental purpose of chapter 2."); *Beiser v. Weyler*, 284 F.3d 665, 673 (5th Cir. 2002) (noting that federal appellate review of orders related to arbitration was necessary, in part, because "[r]educing local variations in how courts interpret and enforce arbitra-

tion clauses makes it easier for businesses engaged in international transactions to use and rely on such clauses"); *Smith/Enron Cogeneration*, 198 F.3d at 96 ("When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable. . . . [P]roceeding otherwise would introduce a degree of parochialism and uncertainty into international arbitration that would subvert the goal of simplifying and unifying international arbitration law."); *McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1209 (5th Cir. 1991) (applying a uniform rule that contract language must waive explicitly the right to remove to federal court granted under the Convention Act, because such rule "accords with the Convention's purpose of ensuring that parties to international business transactions can expect courts to enforce their specifications as to how their disputes will be resolved"); *cf. Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004) (declining an invitation to apply a uniform federal rule in the face of a choice-of-law provision electing Swiss law, but noting: "Defendants also argue that applying federal law to the interpretation of arbitration agreements is required to further the purposes of the FAA and to create a uniform body of federal law on arbitrability. Their uniformity argument has some force *where the parties have not selected the governing law.*" (emphasis added)).[7]

---

[7] Although we have not addressed the present issue head-on, we also have applied "ordinary rules of contract" to hold that a party could not submit to arbitration and later claim an award was unenforceable for lack of a written agreement to arbitrate, a necessary predicate to compelling arbitration under the

(continued...)

Argonaut urges that these cases, primarily addressed to arbitrability of disputes, have no application to the present dispute, which is concededly arbitrable. We cannot agree. The interpretation of the portion of the arbitration clause related to the appointment of arbitrators seems to us very closely aligned with the other issues of interpretation of arbitration agreements under the Convention; such questions present an equally compelling case for a uniform federal rule in the absence of direction to use another law selected by the parties themselves. In all of those areas, the Convention requires, and Congress has recognized in the statutory implementation of the Convention, an important federal interest in consistent and uniform interpretation of agreements governed by the Convention. These cases appropriately address the purposes of the Convention as understood by the Supreme Court. "The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts *and to unify the standards by which agreements to arbitrate are observed* and arbitral awards are enforced in the signatory countries." *Scherk*, 417 U.S. at 520 n.15 (emphasis added). "[C]oncerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for *predictability in the resolution of disputes* require that we enforce the parties' agreement even assuming that a contrary result would be

---

[7] (...continued)
Convention. *Slaney v. Int'l Amateur Athletic Found.*, 244 F.3d 580, 591 (7th Cir. 2001) (citing *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96-97 (2d Cir. 1999)).

forthcoming in a domestic context." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 629 (1985) (emphasis added).

We believe that this overarching federal concern with the uniformity of treatment of international arbitration agreements requires that the issue before us be resolved by a federal common law rule, rather than by a state rule of decision. The Supreme Court has stated that

> [t]here is, of course, "no federal general common law." Nevertheless, the Court has recognized the need and authority in some limited areas to formulate what has come to be known as "federal common law." These instances are "few and restricted," and fall into essentially two categories: those in which a federal rule of decision is "necessary to protect uniquely federal interests," and those in which Congress has given the courts the power to develop substantive law.

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (internal citations omitted). We conclude that the Convention and its implementing federal legislation express a clear federal interest in uniform rules by which agreements to arbitrate will be enforced. We believe this view is consistent with the approaches taken by our sister circuits, which have deemed uniform federal rules of decision appropriate to resolve disputes arising under agreements governed by the Convention. *See, e.g., InterGen N.V.*, 344 F.3d at 144; *Smith/Enron Cogeneration*, 198 F.3d at 96.

We stress that we deal here with more than a generalized federal interest in uniformity that might be insufficient to warrant application of a federal rule. *Cf. O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 87-88 (1994) (noting that

uniformity is the "most generic (and lightly invoked)" basis by a party seeking to assert a federal interest sufficient to demand a federal rule). The uniformity at issue here is one that implicates the very specific interest of the federal government in ensuring that its treaty obligation to enforce arbitration agreements covered by the Convention finds reliable, consistent interpretation in our nation's courts.

> That [this is a] uniquely federal interest does not, however, end the inquiry. That merely establishes a necessary, not a sufficient, condition for the displacement of state law. Displacement will occur only where, as we have variously described, a "significant conflict" exists between an identifiable "federal policy or interest and the [operation] of state law," or the application of state law would "frustrate specific objectives" of federal legislation.

*Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (internal citations and footnote omitted).

Here, the conditions set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), for resort to federal rules have been met. The application of parochial rules that excuse or extend contractual deadlines to agreements arising under the Convention would frustrate one of the *primary* objectives of the United States in becoming a signatory to the Convention: securing uniform standards by which agreements to arbitrate international disputes are governed.

In light of the recognition by the Supreme Court and by our sister circuits that uniformity in determining the manner by which agreements to arbitrate will be enforced is a critical objective of the Convention, we hold that, in this circumstance, the injection of a parochial rule that

interprets a contractual deadline other than by its plain wording is contrary to the interests of the United States as embodied the Convention. Underwriters has identified a specific objective of federal law, namely, to ensure uniform enforcement of agreements to arbitrate. Were we to conclude that state law provided the applicable rule of decision in this case, we would sanction an interpretation of the contract that permitted, necessarily, *non*-uniform results.[8]

In reaching the conclusion that federal law must govern this issue, we acknowledge that, in the context of disputes governed by the Warsaw Convention, which regulates liability for international air travel, the Supreme Court has discouraged federal courts from creating a body of uniform federal common law. *Zicherman v. Korean Air Lines Co.*, 516

---

[8] We note that Argonaut's suggestion, that California law should apply and that it would extend the contract deadline, would permit such an extension of the deadline not only for Sundays and for national holidays, such as Labor Day, but also for Cesar Chavez Day (March 31) and Admission Day (September 9). *See* Cal. Gov. Code § 6700(f), (j). Under this interpretation, in Illinois, Casimir Pulaski Day (March 1) would be exempted. *See* 205 ILCS 630/17(a) (defining holidays); 5 ILCS 70/1.11 (providing that when the time within which an act required by law to be performed ends on a day designated as a holiday by the state, it may be performed on the next business day). In Hawaii, Argonaut may have had the benefit of Prince Jonah Kuhio Kalanianaole Day (March 26) and King Kamehameha I Day (June 11), *see* Hi. Rev. Stat. § 8-1 (listing holidays), *id.* § 1-32 (providing that acts required by contract to be performed on a particular day, which fall on a holiday, may be performed on the next business day). The application of local rules such as these necessarily would defeat the uniformity goals of the Convention.

U.S. 217, 229-31 (1996) ("[T]he Warsaw Convention permit[s] compensation only for legally cognizable harm, but leave[s] the specification of what harm is legally cognizable to the domestic law applicable under the forum's choice-of-law rules."). In reaching its conclusion, the Supreme Court relied on a specific factor not applicable in the New York Convention context, namely, that the Convention itself left undefined the critical issue of which harms would be compensable, apparently in anticipation of the variety of laws of various jurisdictions that would be applied to determine the question, *id.* at 226-27; in short, the Warsaw Convention found "the imposition of uniformity" on the critical question of liability unfeasible and "[t]he Convention neither adopted any uniform rule of its own nor authorized national courts to pursue uniformity in derogation of otherwise applicable law." *Id.* at 230-31. By contrast, although not addressing the choice-of-law issue currently before us, the Supreme Court has recognized that in the context of the *New York Convention*, uniformity of the law is of *paramount* importance. *See Scherk*, 417 U.S. at 520 n.15.[9]

---

[9] From what we have said up to this point, it should be clear that we cannot accept Argonaut's suggestion that we treat a case falling within the Convention as we would treat any domestic case under the FAA, 9 U.S.C. § 1, *et seq.* As we have noted, federal substantive law does not govern disputes falling within the FAA. *See Stone v. Doerge*, 328 F.3d 343, 345 (7th Cir. 2003). Of significance to us in reaching that conclusion was the settled rule interpreting § 10 of the FAA, 9 U.S.C. § 10, that federal courts have limited jurisdiction to compel arbitration; that is, were we to have accepted an argument that federal substantive law applies, federal question jurisdiction would exist in every case of a motion to compel arbitration or
(continued...)

---

[9] (...continued)

enforce an award, a result the Supreme Court already had rejected. *Stone*, 328 F.3d at 345; *see also Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25 n.32 (1983) ("The Arbitration Act . . . . creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 or otherwise. . . . [T]here must be diversity of citizenship or some other independent basis for federal jurisdiction . . . . [for] enforcement of the Act is left in large part to the state courts."). There is an independent grant of federal subject matter jurisdiction in the legislation implementing the Convention, 9 U.S.C. § 203: "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." Federal question jurisdiction unquestionably exists in cases arising under the Convention, and therefore, the considerations that guided our decision in *Stone* are inapposite.

Neither does this court's decision in *Stawski Distributing Co. v. Browary Zywiec S.A.*, 349 F.3d 1023 (7th Cir. 2003), counsel against the use of a uniform federal rule in this matter. *Stawski* holds that state law may limit the application of the parties' choice-of-law under certain circumstances. In *Stawski*, the issue was the validity of the defendant's act in terminating a beer distributorship contract under the Illinois Beer Industry Fair Dealing Act, 815 ILCS 720/1 *et seq.* The parties' agreement to arbitrate the dispute was enforceable, but the choice-of-law provision was invalid in the context of the actual dispute, which concerned violations of duties imposed under state substantive law. *Stawski* does not stand for the broad proposition that state law may override choice-of-law provisions generally. More important to the issue currently before us, neither does it hold that state rules should apply to questions of interpretation of agreements arising under the Convention.

In sum, the substantial federal interests in uniform interpretation of agreements under the Convention justify the application of a uniform rule of decision on the question presented. In the absence of a choice-of-law provision, we conclude that parties are to be bound to the explicit language of arbitration clauses, with no state-specific exceptions that would extend otherwise clear contractual deadlines. Of course, sophisticated commercial parties such as these may provide by contract that thirty days does not include Sundays and holidays, or that a contract with a terminus for performance on a Sunday or holiday (as recognized by some identifiable body—state, federal or otherwise) may be timely performed on the next business day. However, in the absence of such an agreement, or an agreement to apply particular parochial rules of interpretation, we believe a uniform federal rule that enforces strongly arbitration deadlines under the Convention is necessary and appropriate. It serves the purposes identified by the Fourth Circuit in its decision in *I.T.A.D. Associates, Inc. v. Podar Bros.*, 636 F.2d 75 (4th Cir. 1981), that in fashioning the rules we shall employ in our review of agreements under the Convention, we must "foster the adoption of standards which can be uniformly applied on an international scale." *Id.* at 77.

As the foregoing discussion makes plain, the content of the federal rule we today adopt must provide that, when the parties do not otherwise determine by contract, deadlines included in arbitration agreements under the Convention will admit of no exceptions. Thirty days must *mean* thirty days. When the end of the thirty days falls on a Saturday, a Sunday, a national holiday or a state or parochial holiday, the parties will be bound nonetheless

to comply with the deadline for which they bargained.[10]

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[10] Argonaut further has urged this court to hold that the district court had discretion not to refuse to confirm the appointment of the arbitrators under the terms of the Convention. We decline to reach this question, however, because the district court already has indicated that, if it had discretion, it would not exercise it in favor of Argonaut and excuse an otherwise applicable deadline.

---