NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11744

MICHAEL A. VALE  vs.  DAVID J. VALCHUIS & another.[1]


Middlesex.      February 4, 2015. - May 22, 2015.

Present: Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.


Corporation, Close corporation, Valuation of stock, Transfer of
     shares. Massachusetts Arbitration Act. Uniform
     Arbitration Act. Arbitration, Appeal of order compelling
     arbitration, Arbitrable question.



     Civil action commenced in the Superior Court Department on
July 8, 2013.

     A motion to compel arbitration was heard by Kenneth V.
Desmond, Jr., J.

     The Supreme Judicial Court granted an application for
direct appellate review.


     Euripides D. Dalmanieras (James W. Bucking with him) for
New England Cleaning Services, Inc.
     Robert R. Berluti (Edward F. Whitesell, Jr., with him) for
the plaintiff.
     Ben Robbins & Martin J. Newhouse, for New England Legal
Foundation, amicus curiae, submitted a brief.

---

[1] New England Cleaning Services, Inc. (NECS).

CORDY, J.  In this case we decide whether the valuation of stock, pursuant to a stock transfer restriction, is a proper subject for arbitration and, if so, whether and when a selling shareholder may terminate the arbitration process.  The transfer restriction in this case required the shareholder first to offer his stock to the company at his desired price, and then, if the company rejected it, to offer it at a price to be determined by arbitrators.  The plaintiff, Michael A. Vale, invoked this process by tendering an offer to the defendant, New England Cleaning Services, Inc. (NECS).  After doing so, however, he changed his mind regarding his desire to sell and sought to withdraw from the process of valuing his stock.  NECS moved to compel arbitration.

A judge in the Superior Court denied the motion to compel, relying on the doctrine of Palmer v. Clark, 106 Mass. 373, 389 (1871), which distinguishes arbitration from appraisal.  The judge concluded that a mere disagreement over the value of stock was legally insufficient to give rise to arbitration.  On appeal, NECS argues that Palmer and its progeny were abrogated by G. L. c. 251, inserted by St. 1960, c. 374, § 1, as amended (Arbitration Act), which, among other things, provides that a written contract providing for the arbitration "of any existing controversy" is "valid, enforceable and irrevocable" except on

grounds that exist for "the revocation of any contract." See G. L. c. 251, § 1.

We conclude that the distinction between arbitration and appraisal remains valid, but affirm the judge's denial of the motion to compel on other grounds. A stock valuation may be conducted through arbitration, so long as an actual controversy exists regarding the value of the stock. A rejected offer to sell the stock creates such a controversy, provided that the shareholder still desires to sell the stock and the transfer restriction requires him to offer it first to the company. A shareholder may not, however, unilaterally withdraw the controversy from arbitration once it has commenced. Because the shareholder in this case decided not to sell the stock prior to the commencement of arbitration, the controversy to be arbitrated was rendered moot.[2]

1. Background. Vale is a fifty per cent shareholder of NECS, a Massachusetts close corporation. The only other shareholder is Vale's brother, David J. Valchuis. Vale and Valchuis formed NECS in 1977 and both remain directors of the company. In 2005, Vale and Valchuis experienced a breakdown in their business relationship, after Vale stepped down as NECS's president. On several occasions over the ensuing eight years,

---

[2] We acknowledge the amicus brief submitted by the New England Legal Foundation.

Vale expressed a desire to sell his NECS stock.  Article 5 of NECS's articles of incorporation (Article 5) describes a discrete process that a shareholder must follow if he desires to sell his stock.[3]  Vale did not invoke Article 5 during these initial discussions regarding the sale of his stock.

In June, 2013, NECS suspended shareholder distributions on the asserted grounds of increased labor costs and other expenses.  In response, Vale filed a complaint against NECS and Valchuis in Superior Court, alleging breach of fiduciary duty and seeking an accounting.  Vale contended in essence that the

---

[3] Article 5 of the articles of organization (Article 5) of NECS provides, in relevant part:

"Any stockholder . . . desiring to sell, transfer or pledge such stock owned by him or them, shall first offer it to the corporation through the Board of Directors, in the manner following:

"He shall notify the directors of his desire to sell or transfer by notice in writing, which notice shall contain the price at which he is willing to sell or transfer and the name of one arbitrator.  The directors shall within thirty days thereafter either accept the offer, or by notice to him in writing name a second arbitrator, and these two shall name a third.  It shall then be the duty of the arbitrators to ascertain the value of the stock, and if any arbitrator shall neglect or refuse to appear at any meeting appointed by the arbitrators, a majority may act in the absence of such arbitrator.

"After the acceptance of the offer, or the report of the arbitrators as to the value of the stock, the directors shall have thirty (30) days within which to purchase the same at such valuation, but if at the expiration of thirty days, the corporation shall not have exercised the right so to purchase, the owner of the stock shall be at liberty to dispose of the same in any manner he may see fit. . . ."

suspension of distributions was designed to force him to sell his shares at a reduced price. NECS filed a counterclaim, alleging breach of fiduciary duty and breach of contract. The basis of the breach of contract claim was Vale's failure to comply with Article 5.

In October, 2013, during the pendency of the litigation, Vale specifically invoked Article 5 in a letter sent to Valchuis in the latter's capacity as a director of NECS. In the letter, Vale offered his shares to NECS at the price of $5 million and, and as required by Article 5, named one arbitrator. Consistent with Article 5, Vale's letter also stated that "the Board of Directors must within thirty (30) days of this notice either accept this offer, or notify me in writing the name of an arbitrator selected by NECS." On November 1, 2013, NECS declined Vale's offer and named a second arbitrator accordingly. Under the provision of Article 5, the two named arbitrators were then to select a third arbitrator for the purpose of arbitrating (or "ascertaining") the value of the stock.

On November 8, 2013, Vale argued in his motion before the Superior Court that because he had invoked Article 5, NECS's counterclaim for breach of contract was moot. The following week, prior to the selection of the third arbitrator, Vale informed NECS that he was "no longer interested in selling his NECS stock" and that the "arbitration that has not yet commenced

. . . is therefore moot." NECS responded that Vale had no power to terminate the arbitration proceedings that he commenced by invoking Article 5.

NECS filed a motion to compel Vale to arbitrate the value of his stock. The judge concluded that, notwithstanding its references to "arbitrators," Article 5 called for a valuation proceeding in the nature of an appraisal rather than arbitration. Finding that there was no agreement to arbitrate and, therefore, that the Arbitration Act did not apply, the judge denied NECS's motion to compel arbitration. NECS filed an interlocutory appeal pursuant to G. L. c. 251, §§ 2, 18, and we granted NECS's application for direct appellate review.

2. Discussion. The validity and scope of arbitration agreements have been governed by statute in the Commonwealth since at least 1786. See St. 1960, c. 374; St. 1925, c. 294; Rev. St. 1901, c. 194; Pub. St. 1881, c. 188; Gen. St. 1855, c. 147; Rev. St. 1835, c. 114; St. 1786, c. 21. In an early case, Fowler v. Bigelow, 8 Mass. 1, 2 (1811), this court construed the 1786 statute as limiting arbitration to disputes in the nature of personal actions at law and, as a result, held that an arbitrator had no jurisdiction to determine title to real estate. In 1835, the Legislature, citing Fowler, expanded the realm of arbitrable disputes to include "[a]ll controversies, which might be the subject of a personal action

at law, or of a suit in equity."  Rev. St. 1835, c. 114.  The question then arose whether a contractual provision calling for a valuation of property created an agreement to arbitrate.

In Palmer, 106 Mass. at 389, this court concluded that it did not, observing that a "reference to a third person to fix by his judgment the price, quantity or quality of material, to make an appraisement of property and the like, especially when such reference is one of the stipulations of a contract founded on other and good considerations, differs in many respects from an ordinary submission to arbitration."  In an appraisal, for example, "[t]he decision may be made without notice to or hearing of the parties . . . and it may be made upon such principles as the person agreed on may see fit honestly to adopt, or upon such evidence as he may choose to receive."  Id. Our subsequent cases continued to apply the doctrine of Palmer, firmly entrenching the "distinction between the arbitration of a controversy and a contract one term of which calls for the ascertainment by designated persons of values, quantities, losses or similar facts."  Franks v. Franks, 294 Mass. 262, 266 (1936).  See Eliot v. Coulter, 322 Mass. 86, 90 (1947).

The scope of arbitrable disputes remained unchanged until the passage of the present Arbitration Act, which provides that "a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties shall be

valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." G. L. c. 251, § 1. Notably absent from the Arbitration Act is the long-standing limitation of arbitration to actions in law and equity. NECS makes much of this omission, arguing that the Arbitration Act rendered Palmer and its progeny obsolete. We disagree.

Although NECS is correct that the Arbitration Act expanded the scope of arbitrable controversies, the fact of the matter is that a controversy actually must exist to be submitted for arbitration. The long line of cases distinguishing arbitration from appraisal was largely concerned with the absence of a controversy and other indicia of arbitration, rather than the valuation proceeding's genesis in law or equity. Thus, in Franks, 294 Mass. at 266-267, quoting Matter of Fletcher, 237 N.Y. 440, 451 (1924), we explained that the "provisions of the Arbitration Law are properly applicable to any contract where the parties have agreed to substitute for the courts an informal tribunal of their choice in the settlement of a controversy."

Here, the motion judge ruled that Article 5 did not create a controversy and, thus, did not contain an arbitration clause. Relying on Eliot, 322 Mass. at 89, the judge reasoned that although "[t]here may be a dispute about the value of NECS stock . . . such a difference of opinion regarding value does not

convert the valuation process into an arbitration determinative of the rights and liabilities of the parties." The Eliot case does not support this proposition.

In Eliot, supra, we observed that our understanding of the distinction between appraisal and arbitration was in accord with that of the United States Supreme Court in Omaha v. Omaha Water Co., 218 U.S. 180 (1910) (Omaha Water Co.). In that case, the Court held that a valuation proceeding was an appraisal, rather than arbitration, where there was "no antecedent disagreement as to price." Id. at 196. The notion that an arbitration of value required an antecedent disagreement was drawn from an English case, Collins v. Collins, 53 Eng. Rep. 916 (1858), in which "there was a contract for the sale of a brewery at a price to be fixed by persons called arbitrators, one chosen by each party and a third by these two, before entering upon valuation." Omaha Water Co., supra at 194. In Collins, the English court observed that although "fixing the price of a property may be 'arbitration,'" the case before the court involved a mere appraisal. Collins, supra at 918. The court explained the distinction as follows:

> "An arbitration is a reference to the decision of one or
> more persons, either with or without an umpire, of some
> matter or matters in difference between the parties. It is
> very true that in one sense it must be implied that
> although there is no existing difference, still that a
> difference may arise between the parties; yet I think the
> distinction between an existing difference and one which

may arise is a material one, and one which has been properly relied upon in the case. If nothing has been said respecting the price by the vendor and purchaser between themselves, it can hardly be said that there is any difference between them. It might be that if the purchaser knew the price required by the seller, there would be no difference, and that he would be willing to give it. It may well be that if the vendor knew the price which the purchaser would give, there would be no difference, and that he would accept it. It may well be that the decision of a particular valuer appointed might fix the price and might be equally satisfactory to both; so that it can hardly be said that there is a difference between them. Undoubtedly, as a general rule, the seller wants to get the highest price for his property, and the purchaser wishes to give the lowest, and in that sense it may be said that an expected difference between the parties is to be implied in every case, but unless a difference has actually arisen, it does not appear to me to be an 'arbitration.' Undoubtedly, if two persons enter into an arrangement for the sale of any particular property, and try to settle the terms, but cannot agree, and after dispute and discussion respecting the price, they say, 'We will refer this question of price to A.B., he shall settle it,' and thereupon they agree that the matter shall be referred to his arbitration, that would appear to be an 'arbitration,' in the proper sense of the term, and within the meaning of the [Common Law Procedure Act]; but if they agree to a price to be fixed by another, that does not appear to me to be an arbitration."

Id. at 918-919.

The analysis of the English court in Collins is consistent with our precedent. The Palmer and Eliot cases each involved valuation clauses in contracts similar to that of the Collins case, that is, clauses that did not presuppose an antecedent disagreement regarding value. The contracts merely stated that value would be determined by a third party. Palmer, 106 Mass. at 386 ("By the terms of the contract, and as a mode of fixing compensation, the amount of gravel deposited in filling it to a

fixed grade was to be measured on the ground by the city engineer, whose measurements were to be conclusive"); Eliot, 322 Mass. at 87 (lease set annual rent at percentage of "fair valuation of the land comprised in the premises; said fair valuation to be determined . . . by three [3] disinterested parties or a majority of them, one to be chosen by the lessors, one by the lessees and one by the two so chosen").  As such, the contracts did not call for arbitration.

Nonetheless, our cases -- both prior to and following the Arbitration Act -- have recognized that value may be arbitrable so long as an actual controversy exists.  For example, in Franks, 294 Mass. at 265, we explained that if, "before the agreement to arbitrate was entered into the plaintiff had completed a sale delivery of stock to the defendants on terms which obligated the defendants to pay a fair price for it, an issue as to price would be a controversy which might be the subject of a personal action, and so also a proper subject for statutory arbitration."  Although we concluded that no controversy existed in that case, in other cases we have enforced arbitration clauses triggered by antecedent disagreements regarding value.  See, e.g., Berkshire Mut. Ins. Co. v. Burbank, 422 Mass. 659, 660 (1996) (contract provided for submission of damages valuation only if agreement could not be reached); Trustees of Boston & Me. Corp. v. Massachusetts Bay

Transp. Auth., 363 Mass. 386, 387 (1973) (contract provided for submission of price to arbitration only after objection to offer price).

Here, there clearly was -- at least initially -- an arbitrable disagreement regarding the value of Vale's shares. Acting pursuant to Article 5, Vale offered his shares to NECS at the price of $5 million. NECS rejected that offer, ostensibly disputing the value of the shares. See 1 Williston on Contracts § 5:3 (4th ed. 2007) ("As a general principle, any words or acts of the offeree indicating that the offer has been declined . . . amount to a rejection"). At that juncture, a controversy existed that properly could be submitted to arbitration. See Collins, 53 Eng. Rep. at 918-919. Although not dispositive, the fact that Article 5 repeatedly refers to "arbitrators" suggests that the parties intended the valuation proceeding to be an arbitration. General Convention of New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007) ("When the words of a contract are clear, they must be construed in their usual and ordinary sense"). Had the valuation proceeding gone forward, NECS would have, pursuant to Article 5, received an enforceable right to purchase the shares at the price determined by the arbitrators. See Franks, 294 Mass. at 267 (arbitrations result in judgments enforceable in court). See also G. L. c. 251, § 16 (court has jurisdiction to enforce arbitration

awards). Consequently, we hold that Article 5 contains an agreement to arbitrate future controversies regarding valuation, which is properly within the scope of the Arbitration Act.

Vale argues that even if Article 5 contains an arbitration agreement, he was entitled to withdraw his offer to sell his shares at any time prior to NECS's acceptance of the price determined by the arbitrators. NECS counters that Vale is precluded from withdrawing his offer, because his invocation of Article 5's arbitration provisions, i.e., the naming of an arbitrator, was irrevocable. NECS argues further that allowing Vale to invoke and withdraw from arbitration would destroy NECS' right to receive the fruits of Article 5. Neither party's interpretation of Article 5 is sound.

We interpreted a nearly identical stock transfer restriction in Merriam v. Demoulas Super Mkts., Inc., 464 Mass. 721, 731 (2013).[4] In that case, we explained that the "text of

---

[4] The stock transfer restriction in Merriam v. Demoulas Super Mkts., Inc., 464 Mass. 721, 723 n.9 (2013), likewise contained in the articles of organization, provided:

"Any stockholder . . . desiring to sell, assign, transfer, pledge, or hypothecate in any manner such stock owned by him, shall first offer it to the corporation through the Board of Directors, in the manner following:

"He shall notify the directors of his desire to sell . . . in writing, which notice shall contain the price and all other terms at which he is willing to sell . . . and the name of one arbitrator. The directors shall within [thirty] days thereafter either accept the offer or by notice to him

[the stock transfer restriction] begins with a requirement that a shareholder first offer his shares to the corporation, but thereafter describes a discrete process of valuation and subsequent offer at a price determined by arbitrators." Id. at 731. Here, Article 5 operates in the same manner. It prescribes an initial offer of shares at Vale's desired price, which NECS is free to accept or reject. As explained herein, the rejection of that offer creates a controversy, which is to be resolved by arbitration. The question then, is not whether Vale was able to withdraw his offer, but whether he was able to withdraw the controversy from arbitration.[5]

At common law and under earlier statutes, the general rule was that a party could withdraw an issue from arbitration at any

---

in writing, name a second arbitrator, and these two shall name a third. It shall . . . then be the duty of the arbitrators to ascertain the value of the stock. . . .

"After the acceptance of the offer, or the report of the arbitrators as to the value of the stock, the directors shall have thirty (30) days within which to purchase the same at such valuation, but if at the expiration of thirty (30) days, the corporation shall not have exercised the right to so purchase, the owner of the stock shall be at liberty to dispose of the same in any manner he may see fit."

[5] Had the arbitration gone forward, the arbitrators' decision would have conferred on NECS the option to purchase the shares within thirty days at the price their decision set. See Merriam, 464 Mass. at 728 (characterizing same language as creating option); Stapleton v. Macchi, 401 Mass. 725, 729 n.6 (1988) ("An option is simply an irrevocable offer creating a power of acceptance in the optionee").

time prior to the arbitrator's award.  See, e.g., <u>Wallis</u> v. <u>Carpenter</u>, 13 Allen 19, 24 (1866) ("submission to arbitrators is a power; and it is generally true that a power may be revoked at any time before execution"); <u>Allen</u> v. <u>Watson</u>, 16 Johns. 205, 208 (N.Y. Sup. Ct. 1819) ("revocation of the powers of the arbitrators stripped them of all pretence of authority to act as such; and, in the strictest truth, the instrument to which they put their hands and seals, was no award under the submission, for the submission itself was at an end").  This rule arose from the long-standing judicial hostility toward arbitration agreements.  See <u>La Stella</u> v. <u>Garcia Estates, Inc</u>., 66 N.J. 297, 299 (1975) ("English common law at the time of the American Revolution was undoubtedly hostile to arbitrations. . . .  Thus it permitted either party to an arbitration of an existing dispute to withdraw at any time before the actual award and, beyond that, it declared that an agreement to arbitrate future disputes was against public policy and not enforceable").  Today, however, the law "express[es] a strong public policy favoring arbitration as an expeditious alternative to litigation for settling commercial disputes."  <u>Home Gas Corp. of Mass., Inc</u>. v. <u>Walter's of Hadley, Inc</u>., 403 Mass. 772, 774 (1989), quoting <u>Danvers</u> v. <u>Wexler Constr. Co</u>., 12 Mass. App. Ct. 160, 163 (1981).  See <u>Gilmer</u> v. <u>Interstate/Johnson Lane Corp</u>., 500 U.S. 20, 24 (1991) ("purpose [of Federal Arbitration Act] was to

reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts").

The consensus among courts construing modern statutory arbitration clauses is that "a party to a binding, irrevocable arbitration cannot unilaterally withdraw from participation in the arbitration after it has begun." Crihfield v. Brown, 224 W. Va. 407, 412 (2009). See, e.g., Brown v. Engstrom, 89 Cal. App. 3d 513, 523 (1979); Cabus v. Dairyland Ins. Co., 656 P.2d 54, 56 (Colo. Ct. App. 1982); Juhasz v. Costanzo, 144 Ohio App. 3d 756, 762 (2001); Godfrey v. Hartford Cas. Ins. Co., 142 Wash. 2d 885, 897 (2001). See generally 6 C.J.S. Arbitration § 85 (2004) ("Where the agreement is irrevocable, a party may not unilaterally withdraw an issue from arbitration"). Sound policy justifications support this view. Allowing withdrawal after the parties have expended resources in preparing for and participating in the arbitration would be antithetical to the Arbitration Act's purpose of "further[ing] the speedy, efficient, and uncomplicated resolution of business disputes." Floors, Inc. v. B.G. Danis of New England, Inc., 380 Mass. 91, 96 (1980). See Cabus, supra ("to allow one party to withdraw such an issue after going through the arbitration process does not comport with the policy favoring arbitration"). See also

Manatt, Phelps, Rothenberg & Tunney v. Lawrence, 151 Cal. App. 3d 1165, 1171 (1984) (noting unfairness that would result if withdrawal were allowed "after testimony had been taken, evidence received and documents produced and filed"). Moreover, a party should not be permitted to commence arbitration and then withdraw without prejudice to avoid an unfavorable outcome. See Godfrey, supra (parties may not "submit a dispute to arbitration only to see if it goes well for their position"). Here, NECS argues that Vale commenced arbitration when he invoked Article 5. We do not agree.

Arbitration is commonly understood to commence with the filing of a submission agreement or a demand for arbitration. 6 C.J.S. Arbitration, supra at § 9 ("agreement for the submission of an issue to arbitrators constitutes the charter of the entire arbitration proceedings, is a prerequisite to the commencement of a valid proceeding, and defines or limits the issues to be decided"); 1 Domke on Commercial Arbitration § 18:2 (3d ed. Supp. 2014) ("demand for arbitration . . . must contain the name of the parties, the arbitration clause upon which it is based, the nature of the dispute and the relief sought"). The submission agreement or demand is generally "considered to be in effect when the parties agree on arbitrators and the controversy is submitted to them for their determination." 21 Williston on Contracts § 57:45 (4th ed. 2001). See P.A. Finn, B.J. Mone, &

J.N. Seich, Mediation and Arbitration § 12:1 (2004). Thus, unless otherwise provided in the contract or rules governing the arbitration, the mere selection of an incomplete panel of arbitrators does not constitute a commencement of arbitration. See Norfleet v. Safeway Ins. Co., 144 Ill. App. 3d 838, 842 (1986) ("in our view, the appointment of a partial board of arbitrators cannot logically constitute 'initiation' of arbitration proceedings. At the very least, there must be a full panel of arbitrators selected before the proceedings could commence"). Cf. Northcom, Ltd. v. James, 848 So. 2d 242, 247 (Ala. 2002) ("Appointing an arbitrator does not initiate the arbitration process as provided in the Commercial Arbitration Rules").

Here, Article 5 does not set forth the rules for arbitration, nor does it articulate a particular point at which arbitration is deemed to commence. It merely describes a process for appointing arbitrators, which process remained incomplete at the time Vale changed his mind about selling his shares. The record does not reflect that a formal submission agreement or demand for arbitration was ever filed with the arbitrators in this case. Permitting a shareholder to retract his desire to sell at this preliminary stage undercuts neither the express terms of Article 5 nor the policies disfavoring withdrawal from arbitration. See Invicta Plastics, U.S.A., Ltd.

v. Superior Court, 120 Cal. App. 3d 190, 193 (1981) (mere change of mind prior to commencement of arbitration not equivalent to unilateral withdrawal from arbitration).

NECS speculates that allowing Vale to terminate the Article 5 process -- even at this preliminary stage -- will provide incentive for Vale repeatedly to invoke and terminate the process, thereby disrupting NECS's business operations and pressuring it to buy his shares at an exorbitant price. The law is clear, however, that the invocation and termination of the Article 5 process must be in good faith. Merriam, 464 Mass. at 727 ("Although a shareholder in a close corporation always owes a fiduciary duty to fellow shareholders, good faith compliance with the terms of an agreement entered into by the shareholders satisfies that fiduciary duty"). Cf. Certain Underwriters at Lloyd's London v. Argonaut Ins. Co., 500 F.3d 571, 575 (7th Cir. 2007) (withdrawal of arbitration demand did not render controversy moot where withdrawal constituted procedural maneuvering aimed to defeat counterparty's ability to obtain judicial determination of rights). Thus, if Vale were to engage in such vexatious conduct, NECS would have recourse.

Moreover, allowing Vale to change his mind prior to the commencement of arbitration does not destroy NECS's ability to enjoy the fruits of Article 5. The purpose of Article 5 is to provide shareholders in a close corporation the opportunity to

sell their shares at a fair price, while protecting the company against an infusion of undesirable new shareholders. See Merriam, 464 Mass. at 731 ("Valuation processes like those described by [the stock transfer restriction] are often employed in close corporations because there is no ready market for stock in a close corporation"). Should Vale decide to sell his shares in the future, NECS will have the opportunity to purchase them pursuant to Article 5. In view of the foregoing, Vale was entitled to change his mind regarding his desire to sell his shares, thereby rendering moot the controversy to be arbitrated.[6] Without a controversy, there can be no arbitration. G. L. c. 251, § 1.

3. Conclusion. For the reasons set forth herein, we conclude that Article 5 of NECS's articles of incorporation contained a valid agreement to arbitrate future controversies regarding the value of NECS's stock, but that no such controversy existed at the time of NECS's motion to compel arbitration. Therefore, for reasons other than those set forth

---

[6] It does not follow, however, that NECS would be entitled to terminate the Article 5 process. As the Appeals Court explained in Brodie v. Jordan, 66 Mass. App. Ct. 371, 383-384, S.C., 447 Mass. 866 (2006), refusing to proceed with arbitration could improperly hinder Vale's ability to sell his shares on the open market.

by the motion judge, the order denying NECS's motion to compel arbitration is affirmed.[7]

<u>So ordered</u>.

---

[7] In consequence of this conclusion, we need not reach Vale's remaining arguments that NECS waived Article 5, that NECS's board of directors never properly rejected Vale's initial offer, or that Article 5 was superseded by a subsequent declaration of trust.