In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3873

AVERY J. STONE, as Trustee of the Anita M. Stone Family Trust and the Avery J. Stone Trust,

*Plaintiff-Appellee*,

*v.*

DAVID J. DOERGE, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 02 C 1450—**Amy J. St. Eve**, *Judge*.

ARGUED APRIL 4, 2003—DECIDED MAY 2, 2003

Before POSNER, EASTERBROOK, and ROVNER, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Balis, Lewittes & Coleman, Inc., a broker-dealer, handled securities transactions for two trusts of which Avery Stone is the trustee. In some of these transactions, Bear Stearns Securities Corp. served as the clearing broker. In this suit under the federal securities laws, Stone contends that Balis and David Doerge (one of Balis's employees, who served as investment adviser to the trusts) committed fraud in connection with several private placements. (We refer to the defendants collectively as Balis.) Bear Stearns played no role in either

the advice given or the execution of the private placements. Nonetheless, Balis contends that arbitration agreements between Stone and Bear Stearns preclude Stone's access to federal court. When the district court declined to stay the litigation pending arbitration, see 2002 U.S. Dist. LEXIS 19568 (N.D. Ill. Oct. 15, 2002), Balis filed an interlocutory appeal on the authority of 9 U.S.C. §16(a)(1)(A).

Before Bear Stearns undertook to clear any of the trusts' purchases or sales of securities, it insisted that Stone agree to arbitrate any ensuing dispute. The contract that Stone signed with Bear Stearns commits the parties to arbitrate any "controversies arising between [the trusts] and any Bear Stearns entity or any broker for which Bear Stearns acts as clearing agent"; a separate clause makes entities such as Balis third-party beneficiaries of this promise, so that arbitration will be comprehensive. (It would make little sense to have disputes about a transaction litigated between the customer and the introducing broker in parallel with arbitration between the customer and the clearing broker.) Balis observes that it is a "broker for which Bear Stearns acts as clearing agent" and contends that Stone therefore must arbitrate *any* controversy the trusts may have with it, even if Bear Stearns played no role in the transactions and will not participate in the arbitration. The phrase "acts as clearing agent" is incomplete, however. It could be completed with the words "in any transaction" (Balis's preferred reading) or with the words "in the transaction subject to this dispute"; the district judge chose the latter reading as more sensible given the economic and linguistic context of the arbitration clause.

When reaching this conclusion, the district judge referred to New York law, to which the contract itself points. Balis nevertheless contends that any dispute about the scope or meaning of an arbitration clause must be resolved under federal law, starting with the text of the Federal

Arbitration Act and continuing with federal common law to the extent that the Act does not resolve a given controversy. If this were so, however, then any demand for arbitration would arise under federal law, supporting jurisdiction under 28 U.S.C. §1331; yet it is settled that federal courts have jurisdiction over suits seeking to compel arbitration (or enforce awards) only if the parties are of diverse citizenship, or some grant of jurisdiction other than §1331 applies. See, e.g., *Minor v. Prudential Securities, Inc.*, 94 F.3d 1103, 1104-05 (7th Cir. 1996). Thus most interpretive disputes must be resolved under state law. Federal law does affect, however, the extent to which state law may specify special rules for arbitration: any rule of state law disfavoring or prohibiting arbitration for a class of transactions is preempted, see *Southland Corp. v. Keating*, 465 U.S. 1 (1984), "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. Thus generally applicable rules of New York contract law govern, but any rules of state law that give special treatment to arbitration agreements are inapplicable. Some of the state opinions to which the district court referred read as if they state special rules for arbitration, and to that extent they must give way. Remaining principles of New York law just tell courts to enforce the parties' bargain and need not be discussed separately.

Stone does not contend that the agreement is invalid; he argues only that as a matter of normal interpretive principles it does not cover this dispute. Balis contends that federal law supplies a strong presumption in favor of arbitration, but as interpretive rules in contract cases come from state law this is a non-starter. Nothing in the Federal Arbitration Act overrides normal rules of contractual interpretation; the Act's goal was to put arbitration on a par with other contracts and eliminate any vestige of old rules disfavoring arbitration. Arbitration depends on agreement, see *First Options of Chicago, Inc. v.*

*Kaplan*, 514 U.S. 938, 943 (1995); *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 648-49 (1986), and nothing beats normal rules of contract law to determine what the parties' agreement entails. There is no denying that many decisions proclaim that federal policy favors arbitration, but this differs from saying that courts read contracts to foist arbitration on parties who have not genuinely agreed to that device. What is more, most decisions with pro-arbitration language arise from labor relations, where federal common law applies under §301 of the Labor-Management Relations Act, 29 U.S.C. §185, and arbitration serves as a substitute for strikes, lockouts, and other strife. For securities disputes, in contrast, until recently arbitration was *forbidden* as a matter of federal policy. See *Wilko v. Swan*, 346 U.S. 427 (1953). When *Wilko* was overruled, and the primacy of contract restored, the Justices analogized arbitration agreements to forum-selection clauses. See *Rodriguez de Quijas v. Shearson/ American Express, Inc.*, 490 U.S. 477, 482-83 (1989). As there is no thumb on the scale in favor of one judicial forum over another, there is no preference for arbitration over adjudication either. Our job in a case such as this is to implement the *parties*' preferences between judicial and arbitral forums, not to displace that choice with one of our own.

As a matter of ordinary contractual interpretation, this is a simple dispute. The critical language—"acts as clearing agent"—is ambiguous because it does not say whether it is essential that Bear Stearns have acted as clearing agent in the transaction that gave rise to the dispute or is instead enough that Bear Stearns has *ever* acted as clearing agent for Balis. Both economic and linguistic contexts point to the former answer. The linguistic context (which is to say, the rest of the agreement between Stone and Bear Stearns) shows that the function of the third-party-beneficiary clause is to ensure that, *if* arbitration

occurs between Bear Stearns and one of its customers, then every other party to the dispute also will participate in the arbitration so that one forum can provide complete relief. Nothing in the agreement suggests that the reference to "any broker for which Bear Stearns acts as clearing agent" has a broader application. The economic context reinforces this reading. What sense would it make for Stone and Bear Stearns to contract for how securities disputes that had nothing to do with Bear Stearns would be resolved? To see this, suppose that Stone dealt with Balis *only* in connection with private placements, and that as a consequence Bear Stearns had nothing to do with *any* transaction between Stone and Balis. If Stone had no other dealings with Bear Stearns, then any Stone-Balis dispute would be litigated; yet on Balis's view, if Stone had some utterly unrelated dealings with Bear Stearns (if, for example, Stone had opened an account at Bear Stearns), then the Stone-Balis dispute must be arbitrated if, and only if, Balis acts as an introducing broker for Bear Stearns on some *other* customer's account. Why in the world would Stone and Bear Stearns adopt such a patchwork? The district court's reading of the agreement, by contrast, avoids imputing to the parties a crazy-quilt framework.

Ambiguous contracts should be read to make sense of the parties' economic relations. That rule of contract construction applies to arbitration agreements. See *Foufas v. Dru*, 319 F.3d 284 (7th Cir. 2003). The contract between Stone and Bear Stearns makes sense if understood to consolidate, into one arbitral forum, all parties and disputes arising out of securities transactions handled by or through Bear Stearns. It makes little sense, and has a potential for erratic results, if read to cover transactions in which Bear Stearns played no role. On Balis's reading, if one of its employees' cars, carrying stock certificates, hit a vehicle in which Stone was a passenger, then any negligence action commenced by Stone must be arbitrated because of

the happenstance that (a) Stone has signed a securities contract with Bear Stearns, and (b) Balis sometimes acts as an introducing broker for Bear Stearns. Arbitration would occur under the auspices of the New York Stock Exchange or the National Association of Securities Dealers; the customer may choose between the two, but neither offers a sensible forum for tort litigation. This kind of wacky result can be avoided by reading the contract as requiring arbitration if, and only if, Bear Stearns cleared the trades that gave rise to a securities dispute.

AFFIRMED

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*