Richard H. BOULET, et al., Plaintiffs,

v.

**BANGOR SECURITIES INCORPORATED, et al., Defendants.**

No. CIV.04–09–P–H.

United States District Court, D. Maine.

May 26, 2004.

Daniel G. Lilley, Christian C. Foster, Daniel G. Lilley Law Offices, P.A., Portland, ME, for Plaintiffs.

Daniel J. Mitchell, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for Defendants.

## MEMORANDUM DECISION AND ORDER ON DEFENDANT BANGOR SECURITIES INCORPORATED'S MOTION TO DISMISS OR TO STAY AND COMPEL ARBITRATION

HORNBY, District Judge.

The issue in this lawsuit is whether a Client's Margin Agreement obligates brokerage customers to arbitrate disputes with the brokerage firm. Arbitrability hinges on the scope of the term "broker" as used in the Agreement: Does it mean only an individual stock broker or does it include the brokerage firm for which he works? I conclude that the term has broad meaning and that the customers agreed to arbitrate disputes with the brokerage firm. Accordingly, the defendant's motion to dismiss is GRANTED.

### BACKGROUND

The plaintiffs, Richard H. Boulet and Celene Brooke Boulet ("the Boulets"), invested money through broker-dealer Bangor Securities, formerly Livada Securities. The Boulets' individual broker was Gary Hobbs, an employee of Bangor Securities. Bangor Securities used Wexford Clearing Services Corporation ("Wexford") as a so-called "clearing firm." Bangor Securities placed orders to buy and sell securities through Wexford, and Wexford performed centralized accounting and trade execution for accounts held by Bangor Securities.

On December 23, 1998, the Boulets executed a "Client's Margin Agreement." The Margin Agreement was provided to Bangor Securities by Wexford and Bangor Securities provided the agreement to the Boulets. The Margin Agreement contains an arbitration provision as follows:

> The undersigned [customer] agrees, and by carrying an account for the undersigned you [Wexford] agree, all controversies which may arise between us concerning any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration.

The Margin Agreement also provides that the Boulets' "broker is a third-party beneficiary of this Agreement and that the terms and conditions hereof, including the arbitration provision, shall be applicable to all matters between or among myself and

either my broker and/or Wexford Clearing Services Corporation."

On January 13, 2004, the Boulets filed a lawsuit against Bangor Securities and Hobbs. The Boulets allege that Hobbs and Bangor Securities mismanaged their investments and engaged in fraud, in violation of the Securities Exchange Act of 1934, the Electronic Funds Transfer Act, the Maine Securities Act, and the Maine Unfair Trade Practices Act. The Boulets also advance several common law claims, including negligence, negligent misrepresentation, breach of fiduciary duty, fraud, vicarious liability and loss of consortium. The Boulets allege that, as a result of the defendants' misconduct, their investments are worthless. To date, the Boulets have been unable to serve process on Hobbs and are seeking service by publication. Relying on the arbitration clause in the Client's Margin Agreement, Bangor Securities filed this motion to dismiss the complaint or, alternatively, to stay the proceedings and compel arbitration.

### ANALYSIS

■ "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *InterGen N.V. v. Grina,* 344 F.3d 134, 142 (1st Cir. 2003). When deciding whether parties agreed to arbitrate, "courts generally should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). In this case, the arbi-

tration agreement provides that New York law governs.[1] Under New York law, "agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records,* 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170–71 (2002). "[A] written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* Extrinsic evidence of the parties' intent may only be considered if the court determines that the agreement is ambiguous. *Id.*

### (A) Standard of Review

■ In their opposition motion, the Boulets suggest that Fed.R.Civ.P. 12(b) governs the standard of review for this motion to dismiss or compel arbitration. Although the First Circuit has not addressed the question, other courts have held that motions to compel arbitration are subject to the same standard of review as motions for summary judgment. *E.g. Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.,* 636 F.2d 51, 54 & n. 9 (3d Cir.1980) ("[A]lthough styled as a motion to dismiss, in a motion to stay proceedings and/or compel arbitration, the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions."); *Brown v. Dorsey & Whitney,* 267 F.Supp.2d 61, 67 (D.D.C.2003). When ruling on a motion to compel arbitration, the court should "consider facts in the light most favorable to the Plaintiff ... and exercise its 'wide discretion' to look beyond the complaint at pleadings and documents submitted by ei-

---

1. The Boulets say that the defendants "erroneously argue that the Margin Agreement must be interpreted according to principles of New York contract law," but do not elaborate. Opp'n Mot. at n. 1. According to the First Circuit caselaw, "if a state law is applicable to contracts generally, it may be applied to arbitration agreements, but a state law that

is specifically and solely applicable to arbitration agreements is displaced by the [Federal Arbitration Act.]" *PaineWebber, Inc. v. Elahi,* 87 F.3d 589, 593 (1st Cir.1996). *See also McCarthy v. Azure,* 22 F.3d 351, 355–56 & n. 5 (1st Cir.1994). Accordingly, general principles of New York contract law apply but any arbitration-specific New York law does not.

ther party." *Anderson v. Delta Funding Corp.*, 316 F.Supp.2d 554, 558–59 (N.D.Ohio 2004).

■ Indeed, under Rule 12(b), if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." But when a motion to dismiss is converted into a summary judgment motion, the parties must be offered a "'reasonable opportunity' to present pertinent summary judgment materials." *Rubert–Torres v. Hospital San Pablo*, 205 F.3d 472, 475 (1st Cir.2000).

■ The First Circuit has held that "[n]otice of conversion need not be explicit. . . . [T]he notice requirement can be satisfied when a party receives constructive notice that the court has been afforded the option of conversion—a phenomenon that occurs when, for example, the movant attaches to his motion, and relies on, materials dehors the pleadings." *Collier v. City of Chicopee*, 158 F.3d 601, 603 (1st Cir.1998). In this case, Bangor Securities attached the Client's Margin Agreement and an affidavit to its motion. Its legal memorandum relied on the arbitration provision in the Client's Margin Agreement to argue that the Boulets are bound to arbitrate their claims. Even the Boulets cited and quoted the Client's Margin Agreement in their opposition motion. Opp'n Mot. at 8. The Boulets therefore had constructive notice that I would look beyond the pleadings when ruling on Bangor Securities' motion.[2]

## (B) Third-party Beneficiary Status

■■ Under New York law, a third-party beneficiary may enforce the terms of a contract where the contract expressly states that the parties intend to benefit the third party. *E.g.*, *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983, 985–86 (1976). The Boulets signed a Client's Margin Agreement that contains a broad arbitration clause. It explicitly provides that the Boulets' "broker" is a third-party beneficiary of both the Agreement generally and the arbitration clause specifically. Bangor Securities therefore argues that it fits the term "broker" and can compel arbitration. The Boulets contend that the term "broker" in the Margin Agreement refers only to their individual broker, Hobbs, not Bangor Securities.

The threshold question is whether the term "broker" is ambiguous. I conclude that it is not. "Broker" is defined as "[o]ne that acts as an agent for others, as in negotiating contracts, purchases, or sales in return for a fee or commission." The American Heritage Dictionary of the English Language (4th ed.2000). The parties' use of the word "broker" indicates that they are conveying third-party beneficiary status upon the person or entity acting as their agent. Both Hobbs and Bangor Securities acted as the Boulets' agents with regard to their investments. Moreover, the Margin Agreement applies to all of the Boulets' "accounts" and the accounts were held by Bangor Securities, not Hobbs individually. If, as the Boulets contend, "broker" refers only to Hobbs, then disputes between the Boulets and Hobbs

---

**2.** Bangor Securities submitted a supplemental affidavit with its reply. Second Piasio Aff. The affidavit rebuts an argument made by the Boulets in their opposition motion. The Boulets have not moved to strike this affidavit. Nor have they moved for leave to respond to it. Having received no indication that the affidavit is faulty or that the Boulets wish to submit additional evidence, I will consider the affidavit in ruling on Bangor Securities' motion. *See Bayway Refining Co. v. Oxygenated Marketing and Trading A.G.*, 215 F.3d 219, 227 (2d Cir.2000).

and/or Wexler would be resolved in arbitration but the same dispute between the Boulets and Bangor Securities would be litigated. The parties could not possibly have intended such a result. By conveying third-party beneficiary status upon the "broker," the parties intended that all disputes relating to the Boulets' accounts and involving transactions in which Wexford played a role be resolved in arbitration. According to the agreement's plain language, "broker" means both Hobbs and Bangor Securities.[3]

The Boulets contend that, even if Bangor Securities is a third-party beneficiary of their Client Margin Agreement, the arbitration provision applies only if they have a dispute with Wexford. They rely on *Stone v. Doerge*, 328 F.3d 343 (7th Cir.2003), where a broker-dealer tried to enforce an arbitration clause in an agreement between a customer and a clearing firm. In that case, the agreement committed the parties to arbitrate "any controversies arising between [the customer] and [the clearing firm] or any broker for which [the clearing firm] acts as a clearing agent." A separate clause in the agreement made the broker-dealer a third party beneficiary. *Id.* at 344. The broker-dealer sought to invoke the arbitration provision, even though none of the disputed trades were cleared through the clearing firm.

The Seventh Circuit held that, in order for the broker-dealer to compel arbitration, the clearing firm must have acted as a clearing agent in the transactions giving rise to the dispute. *Id.* at 346. The Boulets seize upon one sentence in *Stone*, where the Seventh Circuit says that "[t]he linguistic context (which is to say, the rest of the agreement between [the customer] and [the clearing firm]) shows that the function of the third-party beneficiary clause is to ensure that *if* arbitration occurs between [the clearing agent] and one of its customers, then every other party to the dispute also will participate in the arbitration so that one forum can provide complete relief." *Id.* Based on this sentence, the Boulets argue that Bangor Securities cannot invoke the arbitration clause unless Wexford is seeking arbitration.

■ I find this argument unpersuasive. The Seventh Circuit held that the broker could not compel arbitration in *Stone* because the clearing agent played *no role in any of the disputed transactions*. Here, Bangor Securities has submitted an undisputed affidavit establishing that every stock trade brokered by Bangor Securities on behalf of the Boulets was cleared through Wexford.[4] Second Piasio Aff. at ¶ 4. Even under *Stone*, Bangor Securities may invoke the arbitration provision in the

3. In his first affidavit, Gregg M. Piasio describes the notations located in the upper right hand corner of the second page of the Margin Agreement. In that corner, the "branch," "account number," and "broker #" are identified. Under "broker #" appears 34, which, according to Piasio, was Hobbs' identifying number. Piasio Aff. ¶ 3. The Boulets do not argue that this notation creates ambiguity regarding the meaning of "broker." As I conclude in text, Hobbs was a broker for the Boulets, but so was Bangor Securities.

4. The affidavit actually says Wexford or its predecessor, Prudential Securities Incorpo-

rated. Prudential created Wexford as a subsidiary in 1995. Second Piasio Aff. at ¶ 4. The Boulets signed the Client's Margin Agreement on December 23, 1998. Many of the Boulets' claims rest on pre–1998 events. However, none of the parties addressed whether the arbitration provision applies to claims that accrued before the agreement was signed. The arbitration provision provides that it applies to transactions or agreements "whether entered into prior, on or subsequent to the date hereof." The arbitration provision is therefore retroactive, and covers disputes arising before the contract was signed.

Client's Margin Agreement if Wexford cleared the disputed transactions. Although the *Stone* dictum quoted by the Boulets may be accurate in stating that the function of the third-party clause is to ensure that all participate in any arbitration, that is not its only function.

Moreover, the Boulets' Client's Margin Agreement explicitly provides that the arbitration provision applies "to all matters between or among myself *and either* my broker *and/or* Wexford Clearing Corporation." (Emphasis added). Thus, the agreement contemplates arbitration between the Boulets and their broker, regardless of Wexford's role.

■ Finally, the Boulets argue that, because their dispute does not emanate from a violation of the Client's Margin Agreement, the arbitration provision does not apply. Opp'n Mot. at 6–7. However, the arbitration provision is broader than that. It applies to "*any transaction* or the construction, performance or breach of this or any other agreement ... whether entered into prior, on or subsequent to the date hereof." (Emphasis added). The arbitration clause is not limited to violations of the Client's Margin Agreement and is broad enough to cover all of the Boulets' claims.

### (C) National Association of Securities Dealers ("NASD") Rules

■ The Boulets contend that the arbitration provision in the Client's Margin Agreement is void because it fails to comply with requirements established by the NASD to regulate the form and content of pre-dispute arbitration agreements. Opp'n Mot. at 9. Specifically, the Boulets

say that the arbitration provision violates NASD Conduct Rule 3110, which requires that arbitration provisions be highlighted and include a statement above the signature line indicating that the agreement contains a pre-dispute arbitration clause and where in the agreement the clause is located. Although there is a statement above the Client's Margin Agreement signature line indicating that the agreement contains an arbitration clause, that statement incorrectly says that the arbitration provision is located at paragraph 13. (Paragraph 14 is the correct location). Exactly what is required to satisfy the Rule's condition that the arbitration clause be "highlighted" is unclear. The arbitration provision in the Boulets' Client's Margin Agreement is at least set apart from the rest of the agreement; unlike the rest of the agreement, the arbitration provision is formatted with bullet points.

■ Whether the arbitration provision in the Client's Margin Agreement complies with NASD Conduct Rule 3110 is not necessarily for me to decide. Unless compliance with the NASD rule affects arbitrability, the rule's applicability and effect are questions for the arbitrator, not the court.[5] *PaineWebber, Inc. v. Elahi,* 87 F.3d 589, 595 (1st Cir.1996). Issues other than the existence of an arbitration agreement and whether the subject matter of the dispute is within the scope of the agreement are presumptively not "arbitrability" issues. *Id.* at 599. In order to overcome the presumption, the parties must have clearly and unmistakably expressed an intent to make the issue an "arbitrability" issue. *Id.* at 600. The Client's Margin Agreement reveals nothing to suggest that the

---

**5.** The Boulets cite *Felkner v. Dean Witter Reynolds, Inc.,* 800 F.2d 1466 (9th Cir.1986), for the proposition that noncompliance with NASD rules results in the arbitration provision being void. Opp'n Mot. at 9. However, that case dealt with *regulatory requirements* issued by the Commodity Futures Trading Commission, not NASD industry rules. *Felkner* is therefore inapposite.

parties intended compliance with the NASD Conduct Rule to affect arbitrability. In fact, the agreement does not refer to the NASD Conduct Rules at all.[6] The applicability and effect of noncompliance with Rule 3110 are therefore subject to arbitration. *See id.* (holding that the effect of NASD Code of Arbitration Procedure section 15, a time-bar rule, was not an arbitrability issue and should therefore be determined by the arbitrator). *See also Eureka Homestead Society v. Howard, Weil, Labouisse, Frederichs, Inc.,* 1994 WL 583274, at *6, 1994 U.S. Dist. LEXIS 15097, at *15 (E.D.La., Oct. 20, 1994) ("The effect of noncompliance with [NASD] industry rules are issues which should be addressed by the arbitrators.").

### (D) Jury Trial Demand

■ The Boulets demand a jury trial on all of the issues addressed in this decision. Opp'n Mot. at 12. The Federal Arbitration Act permits parties to demand a jury trial to resolve factual issues surrounding the making of an arbitration agreement or the failure, neglect, or refusal to perform the agreement. 9 U.S.C. § 4. *See also Doctor's Associates Inc. v. Distajo,* 107 F.3d 126, 129 (2d Cir.1997). But a party contesting the "making" of an arbitration agreement must submit evidentiary facts showing that there is a dispute of fact to be tried. *Doctor's Associates,* 107 F.3d at 129–30. *See also Am. Heritage Life Ins. Co. v. Orr,* 294 F.3d 702, 710 (5th Cir.2002) (party must produce "some evidence to substantiate his factual allegations"). The Boulets have not produced any evidence to support their contention that they did not agree to arbitrate claims with Bangor Securities. There being no factual issues for a jury to resolve, the Boulets are not entitled to a jury trial on whether they agreed to arbitrate.

### (E) Stay or Dismiss?

I have concluded that all of the Boulets' claims against Bangor Securities are arbitrable. The First Circuit has held that, when all of the issues before the court are arbitrable, the court may dismiss, rather than stay, the case. *Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141, 156 n. 21 (1st Cir.1998).

When all of the claims raised by the plaintiff are subject to arbitration, dismissal has several advantages:

> Any post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law. This course of action will also make the arbitrability issue immediately appealable and will avoid the litigation expenses and delay if the arbitration conducted were vacated by a later appeal.

*Bangor Hydro–Electric Co. v. New England Telephone and Telegraph Co.,* 62 F.Supp.2d 152, 161 n. 9 (D.Me.1999) quoting *Sea–Land Serv., Inc. v. Sea–Land of P.R., Inc.,* 636 F.Supp. 750, 757–58 (D.P.R. 1986). In light of the foregoing, I conclude that dismissal is appropriate.

### CONCLUSION

The Boulets signed a contract containing a broad arbitration provision. The contract expressly provides that a "broker," a term that includes Bangor Securities, is a third-party beneficiary of the agreement to

---

6. The Client's Margin Agreement does provide that *if* the NASD is selected as the arbitral forum, the NASD Rules of Arbitration Procedure will apply. No arbitral forum has been selected, however, and Rule 3110 is a conduct rule, not a rule of arbitration procedure.

arbitrate. All of the Boulets' claims are arbitrable. The effect of any failure to comply with NASD rules governing arbitration agreements is a question for the arbitrators. Bangor Securities' motion to dismiss is GRANTED.

SO ORDERED.