**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-3567

_____

IN RE: REMICADE (DIRECT PURCHASER) ANTITRUST
LITIGATION

JOHNSON & JOHNSON; JANSSEN BIOTECH, INC.,
                                                    Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-18-cv-00303)
District Judge:  Honorable J. Curtis Joyner

_____

Argued on July 9, 2019

_____

Before:  SHWARTZ, KRAUSE, and FUENTES, *Circuit
Judges*

(Opinion filed: September 13, 2019)

Ashley E. Bass
Covington & Burling
850 10th Street, N.W.
One City Center
Washington, DC 20001

William F. Cavanaugh, Jr.  [Argued]
Adeel A. Mangi
Sara A. Arrow
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036

Leslie E. John
Burt M. Rublin
Ballard Spahr
1735 Market Street
51st Floor
Philadelphia, PA 19103

*Counsel for Appellants*


David F. Sorensen    [Argued]
Andrew C. Curley
Zachary D. Caplan
Berger Montague
1818 Market Street
Suite 3600
Philadelphia, PA 19103

2

Daniel J. Walker
Berger Montague
2001 Pennsylvania Avenue NW
Suite 300
Washington, DC 20006

Archana Tamoshunas, Esq.
Taus Cebulash & Landau
80 Maiden Lane
Suite 1204
New York, NY 10038

     *Counsel for Appellee*

------------------------

OPINION OF THE COURT

------------------------

KRAUSE, *Circuit Judge*.

Johnson & Johnson and its subsidiary Janssen Biotech, Inc. appeal the District Court's denial of their motion to compel arbitration of federal antitrust claims asserted by Rochester Drug Cooperative (RDC) on the ground that those claims fall within the scope of an agreement to arbitrate all claims "arising out of or relating to" a distribution contract between them. We conclude that RDC's antitrust claims, which allege that Johnson & Johnson and Janssen Biotech's anticompetitive conduct caused RDC to pay artificially inflated prices for products purchased under the distribution contract, do "arise out of or relate to" the distribution contract. Accordingly, we

will reverse and remand for the District Court to refer the matter to arbitration.

## I.      Background

RDC is a direct purchaser and wholesaler of Remicade, the brand name of infliximab, which is a "biologic infusion drug"[1] manufactured by Johnson & Johnson and Janssen Biotech (J&J) and used to treat inflammatory conditions such as rheumatoid arthritis and Crohn's disease. For many years, Remicade was the only infliximab drug on the market, but that position was threatened when the Food and Drug Administration (FDA) began approving "biosimilars" of Remicade—that is, drugs produced by other companies that have been deemed by the FDA to have no clinically meaningful differences from Remicade. The thrust of RDC's allegations is that J&J sought to maintain Remicade's monopoly by engaging in an anticompetitive scheme referred to as a "Biosimilar Readiness Plan" (Plan), which consisted of, *inter alia*, (1) "[i]mposing biosimilar-exclusion contracts on insurers that either [i] require insurers to deny coverage for biosimilars altogether or [ii] impose unreasonable preconditions . . . governing coverage"; (2) "[m]ulti-product bundling of J&J's Remicade with other J&J drugs, biologics, and medical devices"; and (3) "[e]xclusionary agreements and bundling arrangements with healthcare providers similar to those entered into with insurers." JA 100.

---

[1] RDC Br. 3. A biologic drug is one "derived from natural, biological sources." *Id.* at 3 n.9 (citation omitted).

4

To be clear, RDC's own contractual relationship with J&J is limited to a 2015 Distribution Agreement (Agreement),[2] which is not alleged to be part of J&J's Plan. The Agreement establishes RDC as an "Authorized Distributor of Record" and sets out various logistical obligations for its distribution of J&J's pharmaceutical products, including Remicade. JA 169. While the Agreement does not specify an exact purchase price for Remicade, it does provide that J&J "will sell Products to the Distributor at the applicable Product's Wholesale Acquisition Cost (the 'WAC' or 'List Price')." JA 172.

The Agreement also contains a "Dispute Resolution" term (i.e., arbitration clause), which provides, in pertinent part:

> 4.21 Dispute Resolution. (a) Any controversy or claim arising out of or relating to this agreement (including without limitation any controversy or claim involving the parent company, subsidiaries, or affiliates under common control of the Company or the Distributor (a "Dispute")), shall first be submitted to mediation according to the *Commercial Mediation Procedures* of the American Arbitration Association ("AAA") . . . .
>
> (b) Any Dispute that cannot be resolved by mediation within 45 days . . . shall be resolved by arbitration in accordance with the Commercial Arbitration Rules of the AAA . . .

---

[2] The Agreement was executed between RDC and JOM Pharmaceuticals Inc., a J&J entity that handles J&J's distribution contracts.

5

and the Federal Arbitration Act, 9 U.S.C. §1 et seq.

JA 188.

RDC brought claims under Sections 1 and 2 of the Sherman Act based on J&J's alleged anticompetitive conduct, and J&J moved to compel arbitration on the basis that those claims "aris[e] out of or relat[e] to" the Agreement. The District Court denied J&J's motion on the ground that RDC's antitrust claims are not arbitrable because they "are separate from, and cannot be resolved based on," the Agreement. *In re Remicade Antitrust Litig.*, No. 18-cv-00303, 2018 WL 5314775, at *8 (E.D. Pa. Oct. 26, 2018) (alterations in original). In so concluding, the District Court relied heavily on this Court's decision in *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165 (3d Cir. 2014), where we explained—in the context of a clause providing for arbitration of disputes "regarding the performance or interpretation of the Agreement"—that whether the plaintiff's claims were within the scope of the clause depended on whether "the claims at issue relate to the performance or interpretation of the Agreement." *Id.* at 174–75. Although the arbitration clause in this case used significantly broader language, the District Court reasoned that RDC's antitrust claims likewise "did not arise from the Agreement [with J&J]," *In re Remicade Antitrust Litig.*, 2018 WL 5314775, at *8, because "whether [J&J] performed its obligations under the Agreement has no bearing on whether it harmed [RDC]," *id.* (alterations in original) (quoting *CardioNet*, 751 F.3d at 175). J&J timely appealed.

## II.    Discussion[3]

On appeal, the parties dispute (A) as a threshold matter, whether federal or state law governs the scope of an agreement to arbitrate, and (B) if state law does apply, whether the arbitration agreement here, properly interpreted, encompasses RDC's statutory antitrust claims.  We address each issue in turn.

### A.    The Law Governing the Scope of Arbitration

The Federal Arbitration Act (FAA) reflects the "national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); *see* 9 U.S.C. § 2 ("A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy . . . arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.").  Because the underlying principle of all arbitration decisions is that "arbitration is strictly a matter of consent,"

---

[3] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a).  Although there has been no final judgment, we have jurisdiction under the Federal Arbitration Act, which permits interlocutory appeals from an order denying a motion to compel arbitration. *See Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 228 (3d Cir. 2008); 9 U.S.C. § 16(a)(1)(B) (providing that an appeal may be taken from an order denying a petition to compel arbitration).  "We exercise plenary review over questions of law concerning the applicability and scope of arbitration agreements." *Zimmer*, 523 F.3d at 228 (citation omitted).

7

*Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (alterations omitted) (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010)), the "FAA requires courts to 'enforce arbitration agreements according to their terms,'" *Lamps Plus*, 139 S. Ct. at 1415 (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018)). But before compelling any party to arbitrate pursuant to the FAA, a court must consider two "gateway" questions: (1) "whether the parties have a valid arbitration agreement at all" (i.e., its enforceability), and (2) "whether a concededly binding arbitration clause applies to a certain type of controversy" (i.e., its scope). *Id.* at 1416–17 (citation omitted); *see Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009).

As we recently observed in *Jaludi v. Citigroup*, No. 16-3577, 2019 WL 3558978 (3d Cir. Aug. 6, 2019), "[i]n applying state law at step one, we do *not* invoke the presumption of arbitrability." *Id.* at *7 (citations omitted). "At step two, however, 'in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement . . . due regard must be given to the federal policy favoring arbitration.'" *Id.* (quoting *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 475 (1989)). Here, because "the parties do not contest the enforceability of the Agreement's arbitration provision," *In re Remicade Antitrust Litig.*, 2018 WL 5314775, at *3, this case turns on step two, that is, whether the alleged antitrust violations fall within the scope of the Agreement's arbitration clause providing for arbitration of any "controversy or claim arising out of or relating to" the Agreement, JA 188.

The parties disagree as to the applicable body of law used to interpret the scope of that clause. While J&J argues that it "is a matter of federal law" and the federal presumption

8

in favor of arbitration therefore ends the inquiry, J&J Br. 8–9 (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 524 (3d Cir. 2009) (quoting *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 290 (3d Cir. 2003))), RDC contends that courts must apply "'ordinary state law principles to evaluate arbitration agreements' (so long as they do not conflict with the FAA)," RDC Br. 18 (quoting *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 228 (3d Cir. 2018)). The truth, we conclude, lies somewhere in between. While RDC's view generally accords better with Supreme Court precedent, at least as the starting point, *see Lamps Plus*, 139 S. Ct. at 1415, we take this opportunity to delve into the interplay between state and federal law and, in the process, to clarify our Court's case law.

To place our holding today in context, we briefly review our case law to date. Early on, we held that "whether a particular dispute is within the class of those disputes governed by the arbitration and choice of law clause is a matter of federal law." *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 43 (3d Cir. 1978). But the Supreme Court disagreed, holding in *First Options of Chicago, Inc. v Kaplan*, 514 U.S. 938 (1995), that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Id.* at 944. And we acknowledged that disagreement in *China Minmetals*, where we observed that under *Becker*, "federal law applie[d] to the interpretation of arbitration agreements," *China Minmetals*, 334 F.3d at 290 (alterations and citations omitted), and then "recognized, however, that the Supreme Court in *First Options* stated that a court deciding whether the parties agreed to arbitrate a certain matter should apply 'ordinary state-law

principles governing contract formation,'" *id.* (citation omitted).

In *China Minmetals*, however, we did not have occasion to hold that *Becker* was abrogated because "whether we appl[ied] federal law or New Jersey law, the result [was] the same." 334 F.3d at 291. But in *Moon v. Breathless Inc.*, 868 F.3d 209 (3d Cir. 2017), the issue was squarely presented, and we definitively announced, as to "an arbitration clause's scope," that "[p]ursuant to the precedent of the Supreme Court of the United States, state law applies: 'When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'" *Id.* at 212–13 (quoting *First Options*, 514 U.S. at 944).

In the case before us today, notwithstanding *First Options* and *Moon*, J&J insists that an arbitration clause's scope "is a matter of federal law," so that the federal antitrust claims at issue here necessarily fall within the scope of the Agreement based on the federal presumption of arbitrability. J&J Br. 9 (emphasis omitted) (quoting *Century Indem.*, 584 F.3d at 524). J&J's argument is premised on *Century Indemnity*—an opinion issued between *China Minmetals* and *Moon*. There, although we ultimately concluded that the arbitration clause was broad enough to include the dispute at issue "with or without the [federal] presumption of arbitrability," *Century Indem.*, 584 F.3d at 556, we also stated that "the determination of whether 'a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law,'" *id.* at 524 (quoting *China Minmetals¸* 334 F.3d at 290).

10

*Century Indemnity* is not controlling here for three reasons. First, as apparent, the language concerning the governance of federal law was ultimately dictum. It was also incomplete. The quoted language from *China Minmetals* was itself quoting *Becker*, and we proceeded to then acknowledge in the very next sentence that *Becker*'s approach was contrary to that taken by *First Options*. *Century Indem.*, 584 F.3d at 524 (quoting *China Minmetals*¸ 334 F.3d at 230 (quoting *First Options*, 514 U.S. at 944)). Yet *Century Indemnity* quoted only the first sentence and omitted the second. Whether an oversight or omission, we must pay heed to intervening Supreme Court precedent. *See Karns v. Shanahan*, 879 F.3d 504, 514–15 (3d Cir. 2018).

Second, when the choice of state or federal law governing the scope of an arbitration clause *was* squarely before us in *Moon*, we held, relying on *First Options*, that "state law applies" and proceeded to apply it. *Moon*, 868 F.3d at 213. We are bound to follow our Circuit's precedent, so *Moon* is controlling. *See Karns*, 879 F.3d at 514 (quoting 3d Cir. I.O.P. 9.1).

Third, as we also recognized in *Moon*, "the precedent of the Supreme Court of the United States" has made clear that state law serves as the baseline for ascertaining an arbitration clause's scope, notwithstanding the fact that federal law may also, under certain circumstances, have a role to play. 868 F.3d at 212–13; *see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) ("While the interpretation of an arbitration agreement is generally a matter of state law, the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion." (internal quotation marks and citations omitted)); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630

11

(2009) (holding that the FAA "creates substantive federal law . . . requiring courts to place [arbitration] agreements upon the same footing as other contracts," but that nothing in the FAA "purports to alter background principles of state contract law regarding the scope of [arbitration] agreements" (internal quotation marks citation omitted)).

So, what is the role of federal law in interpreting the scope of an arbitration agreement? As we noted in *Jaludi*, "in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement . . . due regard must be given to the federal policy favoring arbitration." 2019 WL 3558978, at *7 (quoting *Volt Info. Scis.*, 489 U.S. at 475). Thus, the federal law favoring arbitration embodied in the FAA "provides the default rule" where no state law definitively determines whether a given claim is inside or outside the scope of an arbitration agreement. *Lamps Plus*, 139 S. Ct. at 1418 (noting that the Supreme Court "ha[s] repeatedly held that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration" (citations omitted)); *see White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017) ("[T]he presumption of arbitrability applies only where an arbitration agreement is ambiguous about whether it covers the dispute at hand. Otherwise, the plain language of the contract holds." (citation omitted)). And certain general principles of federal law apply in resolving that ambiguity, *see, e.g.*, *Battaglia v. McKendry*, 233 F.3d 720, 725 (3d Cir. 2000) (noting that this presumption is "particularly applicable where the arbitration clause at issue is broad"), and enforcing arbitration agreements, *see, e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (noting that "courts must rigorously enforce arbitration agreements according to their terms (internal quotation marks and citation omitted)).

12

Additionally, federal law may also come into play by way of preemption.  For example, federal law will preempt otherwise-applicable state law that would invalidate an agreement to arbitrate not simply by application of "generally applicable contract defenses, such as fraud, duress, or unconscionability," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)), but rather because it violates the FAA's so-called "equal-treatment principle"—that is, if it "appl[ies] only to arbitration or [] derive[s] [its] meaning from the fact that an agreement to arbitrate is at issue," *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (citation omitted).  And just this past term, the Supreme Court held that a state law rule of *contra proferentem* was preempted to the extent it was used to construe an agreement to arbitrate claims on a classwide basis and, thus, to the extent it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the FAA."  *Lamps Plus*, 139 S. Ct. at 1416 (internal quotation marks omitted) (quoting *Concepcion*, 563 U.S. at 352); *accord Stone v. Doerge*, 328 F.3d 343, 345 (7th Cir. 2003) (Easterbrook, J.) (explaining that while "most interpretive disputes must be resolved under state law," federal law "does affect . . . the extent to which state law may specify special rules for arbitration: any rule of state law disfavoring or prohibiting arbitration for a class of transactions is preempted" (citation omitted)).

In sum, while federal law may tip the scales in favor of arbitration where state interpretive principles do not dictate a clear outcome, *see, e.g.*, *White*, 870 F.3d at 262, may displace state law through preemption, *see, e.g.*, *Lamps Plus*, 139 S. Ct. at 1416, or may inform the interpretive analysis in other ways, *see, e.g.*, *Battaglia*, 233 F.3d at 725; *Am. Express*, 570 U.S. at

13

233, applicable state law governs the scope of an arbitration clause—as it would any other contractual provision—in the first instance.[4] We therefore turn to the question of the scope of the arbitration clause before us, looking to the applicable state law—that of New Jersey.[5]

### B. The Scope of the Agreement's Arbitration Clause

When it comes to ascertaining the scope of an arbitration provision, New Jersey "[c]ourts have generally read the terms 'arising out of' or 'relating to' [in] a contract as

---

[4] Indeed, it would not be practicable, as J&J posits, to apply state law when it comes to the enforceability or validity of an arbitration provision (i.e. at step one), but to exclusively apply federal law when it comes to interpreting the provision's scope (i.e. step two), particularly given how easily arguments pertaining to scope can be repackaged in terms of enforceability. *See* Oral Argument at 33:52-34:41 (RDC arguing that, whether viewed as a question of enforceability or scope, "we end up in the same place" because "if this agreement is construed to cover our antitrust claims, it is unenforceable").

[5] The Agreement states only that "the arbitrator" (e.g., not the courts) "must interpret any dispute arising out of or relating to this agreement in accordance with the laws of New Jersey," JA 188, and does not make explicit that the law of New Jersey governs interpretation of the contract generally. Nonetheless, as the parties proceed on that assumption, so do we. *See Moon*, 868 F.3d at 213 (assuming without deciding that the state law on which the parties agreed applied to the interpretation of an arbitration clause).

14

indicative of an 'extremely broad' agreement to arbitrate any dispute relating in any way to the contract." *Curtis v. Cellco P'ship*, 992 A.2d 795, 802 (N.J. Super. Ct. App. Div. 2010) (alterations in original) (citations omitted). "Such broad clauses have been construed to require arbitration of any dispute between the contracting parties that is connected in any way with their contract." *Id.* (citations omitted).

Consistent with that approach, the New Jersey Appellate Division has held that the phrase "[a]ny other unresolved disputes arising out of this Agreement" encompasses antitrust claims challenging allegedly anticompetitive conduct that resulted in overcharges based on the underlying contract. *EPIX Holdings Corp. v. Marsh & McLennan Cos.*, 982 A.2d 1194, 1199, 1204 (N.J. Super. Ct. App. Div. 2009), *overruled in part on other grounds by Hirsch v. Amper Fin. Servs.*, 71 A.3d 849 (N.J. 2013). Relying on the Second Circuit's similar reasoning in *JLM Indus., Inc. v. Stolt–Nielsen, S.A.*, 387 F.3d 163, 178 (2d Cir. 2004), the Appellate Division explained that "the claims the . . . defendants seek to arbitrate not only 'arise out of', but are undeniably intertwined with the contract . . . since it is the fact of [plaintiff's] entry into the contract containing the allegedly inflated price and other oppressive terms that gives rise to the claimed injury." *EPIX Holdings Corp.*, 982 A.2d at 1207. And on that basis, the court found it "difficult to conceive how plaintiff could maintain its claim for damages without reference to, and reliance upon, the underlying contract." *Id.*; *see Pop Test Cortisol, LLC v. Merck & Co., Inc.*, A-5403-12T4, 2014 WL 1660605, at *1, *6 (N.J. Super. Ct. App. Div. Apr. 28, 2014) (applying *EPIX* and holding that an arbitration provision applying to "[a]ll disputes arising out of or relating to this Agreement" encompassed state statutory claims and federal RICO claims).

15

That reasoning applies equally here, where the gravamen of RDC's complaint is that J&J's anticompetitive Plan "enabled [it] to sell its branded Remicade infliximab product at artificially inflated prices," JA 132, and the only "inflated price[]" that could have caused RDC's injury was the price it paid J&J for Remicade, i.e., the WAC or list price provided in the Agreement, JA 172. Thus, RDC's antitrust claims are "undeniably intertwined" with the Agreement because "it is the fact of [RDC's] entry into the [Agreement] containing the allegedly inflated price . . . that gives rise to the claimed injury."[6] *EPIX Holdings Corp.*, 982 A.2d at 1207; *see also JLM Indus., Inc.*, 387 F.3d at 173, 176 (holding antitrust claims "aris[e] out of" contracts where the "central factual allegations of the complaint" involve "a core issue of the contracts between the parties—allegations that the price terms set forth in those contracts have been artificially inflated as a result of the [anticompetitive conduct]" of the defendants); *S+L+H S.p.A. v. Miller–St. Nazianz, Inc.*, 988 F.2d 1518, 1524

---

[6] J&J also argues that two later provisions in the "Dispute Resolution" section expand the universe of arbitrable issues beyond those "arising out of or related to" the Agreement: namely, portions of subsection (d) providing that "EACH PARTY IRREVOCABLY WAIVES ITS RIGHT TO TRIAL OF ANY ISSUE BY JURY," and limiting an arbitrator's award of enhanced damages, interest, or attorneys' fees "EXCEPT AS MAY BE REQUIRED BY STATUTE." J&J Br. 19 (quoting JA 188). The District Court rejected that argument, explaining that the structure of the "Dispute Resolution" section indicates that those provisions refer only to "claims otherwise encompassed by [subsection (a)]," *In re Remicade Antitrust Litig.*, 2018 WL 5314775, at *5, and we agree.

16

(7th Cir. 1993) (observing that a claim "that draws its very essence from the fact of and performance under the [Agreement] in question . . . necessarily is a claim that arises out of and relates to the Agreement" (first alteration in original) (internal quotation marks omitted)).

RDC contends that ascertaining the scope of the arbitration clause by considering whether "the claim[s] would not exist" except for the Agreement, RDC. Br. 36, contravenes this Court's recent admonition against "equat[ing] the meaning of 'arising out of' with the concept of but-for causation," *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 100 n.59 (3d Cir. 2018) (quoting *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 602 (7th Cir. 1994) ("'Arising out of' and 'arising under' are familiar phrases, and courts have resisted the siren call of collapsing them to but-for causation.")).  But we are not swayed by the fact that RDC's antitrust claims could not exist but-for the Agreement; what is dispositive is that they cannot be adjudicated without "reference to, and reliance upon," it.[7]  *EPIX Holdings Corp.*, 982 A.2d at 1207.

---

[7] By contrast, many of the cases on which RDC relies (none of which are binding on this Court) involve antitrust claims that the court could "resolve . . . *without reference to* the agreement containing the arbitration clause."  *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 814 (6th Cir. 2008) (emphasis added); *see also AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999) (holding that antitrust claims alleging supracompetitive prices were not arbitrable because the underlying contract, "though it d[id] provide for shared information and cooperation, d[id] not regulate the price [defendant] may charge").  In any event, to the extent there

And even if RDC's inevitable reliance on the Agreement to prove injury were not enough to render its claims "arising out of" the Agreement, they need only "relat[e] in any way to the [Agreement]" to be "related to" it. *Curtis*, 992 A.2d at 802 (citation omitted). "An arbitration provision covering claims 'relating to' a contract is broader than one which covers claims merely arising out of a contract." *Yale Materials Handling Corp. v. White Storage & Retrieval Sys., Inc.*, 573 A.2d 484, 486 (N.J. Super. Ct. App. Div. 1990) (citation omitted). New Jersey courts have interpreted the term "relating to" in the arbitration clause context to be "extremely broad," *Angrisani v. Fin. Tech. Ventures, L.P.*, 952 A.2d 1140, 1146 (N.J. Super. Ct. App. Div. 2008), which we understand to mean—as we have held in the forum selection clause context—that a claim need only have "some 'logical or causal connection'" to the agreement to be related to it, *John Wyeth & Bro. Ltd v. Cigna Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (quoting *Webster's Third New International Dictionary* 1916 (1971)). Here, we have no difficulty finding that RDC's antitrust claims "relate to" the Agreement, which sets the drug prices and governs the commercial relationship between the parties.

RDC argues, in the alternative, that even if the arbitration provision is broad enough to encompass RDC's antitrust claims, the claims are nonetheless outside the scope of the Agreement because the provision fails to comply with New Jersey's rule of contractual interpretation requiring waivers of constitutional or statutory rights to be stated "clearly and unambiguously." *Atalese v. U.S. Legal Servs. Grp.*, 99

---

may be tension between those holdings and that of the Second Circuit in *JLM*, New Jersey courts to date have embraced the latter. *See EPIX Holdings Corp.*, 982 A.2d at 1207.

18

A.3d 306, 309 (N.J. 2014).  Underlying New Jersey's rule is the notion that agreements to arbitrate, "like any other contract, must be the product of mutual assent," *id.* at 312–13 (internal quotation marks and citation omitted), and because "an average member of the public may not know—without some explanatory comment—that arbitration is a substitute for the right to have one's claim adjudicated in a court of law," *id.* at 313, arbitration clauses will not be construed to encompass constitutional or statutory rights absent some "concrete manifestation" of the intention to do so, *Garfinkel v. Morristown Obstetrics & Gynecology Assocs.*, 773 A.2d 665, 672 (N.J. 2001); *see Moon*, 868 F.3d at 214–15 (interpreting the rule as requiring an arbitration clause to contain three components: "First, it must identify the general substantive area that the arbitration clause covers"; "Second, it must reference the types of claims waived by the provision"; "Third, it must explain the difference between arbitration and litigation").

While the New Jersey Supreme Court has not definitively resolved the scope of the rule, it has applied it thus far only in the context of employment and consumer contracts. *See Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 199 A.3d 766, 784 (N.J. 2019) (consumer); *Atalese*, 99 A.3d at 312–13 (N.J. 2014) (consumer); *Martindale v. Sandvik, Inc.*, 800 A.2d 872, 883 (N.J. 2002) (employment); *Garfinkel*, 773 A.2d at 665 (employment); *see also Moon*, 868 F.3d at 214–15 (employment).  Moreover, in its most recent discussion of the rule, the New Jersey Supreme Court emphasized that "the consumer context of the contract [in *Atalese*] mattered," *Kernahan*, 199 A.3d at 777, and that the "twin concerns" animating its application of the rule there were that (1) "a consumer is not necessarily versed in the meaning of law-

19

imbued terminology about procedures tucked into form contracts" (as opposed to "individually negotiated" ones), and that (2) "plain language explanations of consequences had been required in contract cases in numerous other settings where a person would not be presumed to understand that what was being agreed to constituted a waiver of a constitutional or statutory right," *id*. Neither concern applies to J&J and RDC's Agreement.

Even before *Kernahan*'s strong intimation that the rule applies only where the parties have unequal bargaining power and levels of sophistication—as in the employment and consumer contexts—the New Jersey Appellate Division has held on several occasions that the rule "d[oes] not extend . . . to commercial contracts," i.e., contracts that resulted "from a lengthy negotiation process" and where no party was an "average member[] of the public."[8] *Victory Entm't, Inc. v. Schibell*, No. A-3388-16T2, 2018 WL 3059696, at *8 (N.J. Super. Ct. App. Div. June 21, 2018) (citation omitted); *see also Columbus Circle N.J., LLC v. Island Constr. Co.*, No. A-1907-15T1, 2017 WL 958489, at *3 (N.J. Super. Ct. App. Div. Mar. 13, 2017) (rejecting application of *Atalese* to the contract at issue, which was not "a consumer contract of adhesion where [one party] . . . possessed superior bargaining power and was the more sophisticated party" (alteration in original) (citation omitted)); *Gastelu v. Martin*, No. A-0049-14T2, 2014 WL 10044913, at *6 & n.4 (N.J. Super. Ct. App. Div. July 9, 2015)

---

[8] Where an unanswered question of New Jersey law requires us to "predict how the Supreme Court of [New Jersey] would decide the question," we give "due regard" to decisions of the intermediate appellate courts. *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 237 (3d Cir. 2010) (citation omitted).

20

("Parties to a commercial contract can express their intention to arbitrate their disputes rather than litigate them in court, without employing any special language . . . . In the present case . . . we are dealing with commercial business transaction [sic] and, therefore, the standard is not as stringent [as the one put forward in *Atalese*].").

Here, there is no dispute that the Agreement is a commercial contract or that both J&J and RDC are "highly sophisticated participant[s] in the pharmaceutical market," J&J Br. 27, as opposed to "average member[s] of the public," *Atalese*, 99 A.3d at 312. Taking into account the illustrative statements in *Kernahan*, and affording "due regard" to the decisions of the intermediate appellate courts declining to extend the rule to commercial contracts, *Specialty Surfaces*, 609 F.3d at 237, we conclude that the rule does not apply to the Agreement between J&J and RDC in any event, and thus does not narrow the scope of the arbitration provision.

Because we conclude that the rule does not apply here, we need not address whether the Agreement's arbitration clause satisfies it or, if it does not, whether notwithstanding the New Jersey Supreme Court's statement in *Atalese* that the rule is "not specific to arbitration provisions," 99 A.3d at 313, it would be preempted—either because it is "too tailor-made to arbitration agreements . . . to survive the FAA's edict against singling out those contracts for disfavored treatment," *Kindred Nursing Ctrs.*, 137 S. Ct. at 1427, or because it "interferes with fundamental attributes of arbitration," *Lamps Plus*, 139 S. Ct. at 1418.[9]

---

[9] We note that the New Jersey Supreme Court may address this issue in *Skuse v. Pfizer, Inc.*, 202 A.3d 1 (N.J.

21

Accordingly, because RDC's antitrust claims "aris[e] out of or relate[] to" the Agreement, they must be arbitrated.

## III. Conclusion

For the foregoing reasons, we will reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.

---

Super. Ct. App. Div. 2019), *certif. granted*, C-922 Sept. Term 2018, 2019 WL 2403144 (N.J. June 3, 2019); *see also Kernahan*, 199 A.3d at 786 (Albin, J., concurring) (explaining that New Jersey requires "that an arbitration clause must simply explain to the average consumer what it forecloses . . . [and] do[es] not discriminate against an arbitration agreement by requiring it to [explain its purpose]"); *Atalese*, 99 A.3d at 313–14 (giving examples of the New Jersey "clear and unmistakable" requirement being applied in various non-arbitration contexts).